IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

THE ESTATE OF DEBORAH A. ETHRIDGE, an Arizona probate estate,
by and through its Co-Personal Representatives, TAMIKA PRADIA and
KEYANA KING; TAMIKA PRADIA and KEYANA KING, in their
individual capacities and as statutory beneficiaries of the Estate of
Deborah Ethridge, *Plaintiffs/Appellees*,

*v.*

RECOVERY MANAGEMENT SYSTEMS, INC., an Arizona corporation
authorized to do and doing business in Maricopa County, Arizona;
SOUTHWEST CATHOLIC HEALTH NETWORK CORPORATION, an
Arizona corporation authorized to do and doing business in Maricopa
County, Arizona by, through, and under the name of MERCY CARE
PLAN and MERCY CARE ADVANTAGE, Arizona businesses,
*Defendants/Appellants*.

No. 1 CA-CV 12-0740
FILED 5-13-2014

———————————————

Appeal from the Superior Court in Maricopa County
No.  CV 2011-014963
The Honorable Michael J. Herrod, Judge

**REVERSED AND REMANDED**

———————————————

COUNSEL

Knapp & Roberts, PC, Scottsdale
By Craig A. Knapp, David L. Abney

*Counsel for Plaintiffs/Appellees*

Gibson Dunn & Crutcher, LLP, Washington, D.C.
By Miguel A. Estrada, Robert E. Johnson

*Co-Counsel for Defendants/Appellants*

Fennemore Craig, PC, Phoenix
By Jill M. Covington, Scott L. Altes, Theresa Dwyer-Federhar

*Co-Counsel for Defendants/Appellants*

---

## OPINION

Judge Patricia K. Norris delivered the opinion of the Court, in which Presiding Judge Peter B. Swann and Judge Samuel A. Thumma joined.

---

**N O R R I S,** Judge:

**¶1**        In this opinion, we hold Part C of the Medicare Act and its associated regulations preempt Arizona's anti-subrogation doctrine and, therefore, a Medicare Advantage plan may seek reimbursement for medical expenses it paid for one of its enrollees from the settlement of claims that sought compensation for those expenses on behalf of the enrollee. Accordingly, we reverse the judgment of the superior court and remand for further proceedings consistent with this opinion.

### FACTS AND PROCEDURAL BACKGROUND[1]

**¶2**        In September 2007, Deborah Ethridge died as a result of neglect by her caregiver, a nursing home. Ethridge had contracted to receive Medicare benefits from Appellant Mercy Care Advantage, a private health insurer operating a Medicare Advantage plan. Pursuant to the plan, Mercy Care Advantage paid for the medical services Ethridge

---

[1]Because this appeal arises out of a judgment on the pleadings, we accept as true the well-pleaded facts alleged in the complaint. *Save Our Valley Ass'n v. Ariz. Corp. Comm'n*, 216 Ariz. 216, 218, ¶ 6, 165 P.3d 194, 196 (App. 2007) (citation omitted).

received as a consequence of the nursing home's negligence ("medical expenses").

¶3            Ethridge's estate sued the nursing home for abuse and neglect under Arizona's Adult Protective Services Act ("APSA"), *see* Ariz. Rev. Stat. ("A.R.S.") §§ 46-451 to -459 (Supp. 2013),[2] and, *inter alia*, sought compensation for Ethridge's medical expenses.[3]   Ethridge's statutory beneficiaries also participated in the case and requested compensatory and punitive damages under Arizona's wrongful death statutes.  *See* A.R.S. §§ 12-611 to -613 (2003).[4]   The estate and statutory beneficiaries (collectively, the "Estate" unless separately identified) ultimately settled their claims against the nursing home for $1.2 million.

¶4            After the settlement, Mercy Care Advantage requested the Estate to reimburse it for the medical expenses.  In response, the Estate sued Mercy Care Advantage and its associated entities, seeking a declaratory judgment that Mercy Care Advantage was not entitled to reimbursement for the medical expenses under Arizona's anti-subrogation doctrine -- a common law doctrine that bars the subrogation or assignment of personal injury claims.  *See State Farm Fire & Cas. Co. v. Knapp*, 107 Ariz. 184, 185, 484 P.2d 180, 181 (1971); *Allstate Ins. Co. v. Druke*, 118 Ariz. 301, 304, 576 P.2d 489, 492 (1978).   On cross-motions for judgment on the pleadings, the superior court determined that federal Medicare law and its associated regulations did not preempt Arizona's anti-subrogation doctrine, thus agreeing with the Estate that Mercy Care Advantage was not entitled to reimbursement.

---

[2]Although the Arizona Legislature amended statutes cited in this decision after Ethridge's death, the revisions are immaterial.  Thus, we cite to the current version of these statutes.

[3]A claim under the APSA is not "limited or affected by the death of the vulnerable adult," A.R.S. § 46-455(P), and may be brought on behalf of such an adult by his or her personal representative.  *Winn v. Plaza Healthcare, Inc. (In re Estate of Winn)*, 225 Ariz. 275, 278, ¶ 16, 237 P.3d 628, 631 (App. 2010) (citation omitted).

[4]A wrongful death claim is a statutory cause of action for "damages sustained by the statutory beneficiaries and is not derivative or a continuation of a claim originating with the decedent." *Winn*, 225 Ariz. at 278 n.7, ¶ 16, 237 P.3d at 631 n.7 (citation omitted).

## DISCUSSION

¶5        The narrow issue here is one of preemption: Does Part C of the Medicare Act[5] and its associated regulations preempt Arizona's common law anti-subrogation doctrine, thereby allowing a Medicare Advantage plan to seek reimbursement for medical expenses it paid for an enrollee from the settlement of claims that sought compensation for those expenses on behalf of the enrollee?[6] If Congress intended Medicare Part C and its associated regulations to preempt state common law doctrines, then Mercy Care Advantage is entitled to seek reimbursement. If, however, Congress did not so intend, then Arizona's anti-subrogation doctrine applies and the superior court appropriately granted judgment for the Estate.

¶6        This issue is one of law and subject to de novo review. *Save Our Valley Ass'n*, 216 Ariz. at 218-19, ¶ 6, 165 P.3d at 196-97 (citation omitted) (in reviewing judgment on the pleadings, appellate court reviews superior court's legal conclusions de novo); *Hutto v. Francisco*, 210 Ariz. 88, 90, ¶ 7, 107 P.3d 934, 936 (App. 2005) (citation omitted) (federal preemption issues reviewed de novo). To decide this issue, we begin with a discussion of Medicare and its evolution.

I.   Medicare, Medicare Part C, and the Relevant Regulatory Provisions

¶7        Medicare is a federal health insurance program benefitting individuals who are over 65, or have a disability, or are suffering from end-stage renal disease. 42 U.S.C.A. § 1395c. The Centers for Medicare and Medicaid Services ("CMS"), an operating division of the Department

---

[5]42 U.S.C.A. §§ 1395 to 1395 kkk-1 (West, Westlaw through P.L. 113-92 (excluding P.L. 113-76, 113-79, and 113-89)). Although Congress amended certain provisions of the Medicare Act cited in this opinion after Mercy Care Advantage requested reimbursement, the amendments are immaterial. Thus, we cite to the current provisions unless otherwise noted.

[6]The parties agree that, absent preemption, the anti-subrogation doctrine would bar Mercy Care Advantage's reimbursement claim. *See generally Lingel v. Olbin*, 198 Ariz. 249, 8 P.3d 1163 (App. 2000) (neither wrongful death claim nor proceeds from such a claim are assignable).

of Health and Human Services, administers the program. Medicare is divided into two types of insurance: Medicare Part A covers hospital care and related services, 42 U.S.C.A. §§ 1395c to 1395i-5, and Medicare Part B covers other medical services and equipment. 42 U.S.C.A. §§ 1395j to 1395w-5.[7]

¶8        When Medicare was enacted in 1965, the federal government was, primarily, financially responsible for all covered items and services. Because of rising Medicare costs, however, in 1980, Congress enacted Medicare secondary payer legislation ("MSP legislation"). Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599 (codified as amended at 42 U.S.C.A. § 1395y(b)); *Zinman v. Shalala*, 67 F.3d 841, 843 (9th Cir. 1995). The MSP legislation made Medicare secondary to any "primary plan," meaning that Medicare pays healthcare costs only when no other coverage is available through another insurance plan, from a tortfeasor, or otherwise. 42 U.S.C.A. § 1395y(b)(2)(A).[8]

---

[7]For purposes of this opinion, we refer to Parts A and B, collectively, as "traditional Medicare."

[8]A "primary plan" is "a group health plan or large group health plan, . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance." 42 U.S.C.A. § 1395y(b)(2)(A)(ii). Before 2003, most federal courts interpreted this definition narrowly to encompass only formalized insurance plans, and not tortfeasors. *In re Orthopedic Bone Screw Products Liab. Litig.*, 202 F.R.D. 154, 166 (E.D. Pa. 2001), *rev'd on other grounds sub nom. Fanning v. United States*, 346 F.3d 386 (3d Cir. 2003); *Thompson v. Goetzmann*, 337 F.3d 489, 498 n.22 (5th Cir. 2003); *see Mason v. Am. Tobacco Co.*, 346 F.3d 36, 42-43 (2d Cir. 2003) (agreeing with federal cases holding MSP legislation may not be used to pursue non-insurance entity, such as uninsured tortfeasor). *But see United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 896-98 (11th Cir. 2003). In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act to, *inter alia*, clarify that a primary plan includes tortfeasors. It did so by defining a "self-insured plan" as "[a]n entity that engages in a business, trade, or profession . . . if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part" and by specifying that a primary plan was required to reimburse Medicare if the plan's responsibility to pay had been demonstrated "by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether

¶9        Even though not required, Medicare may conditionally pay a beneficiary's medical expenses when that beneficiary suffers an injury covered by a primary plan. 42 U.S.C.A. § 1395y(b)(2)(B)(i). If the beneficiary subsequently recovers the medical expenses from the primary plan, the beneficiary must reimburse Medicare. *Zinman*, 67 F.3d at 843; 42 U.S.C.A. § 1395y(b)(2)(B)(ii) ("[A] primary plan [or] an entity that receives payment from a primary plan, *shall* reimburse" Medicare once the primary plan's responsibility has been established by a judgment or settlement. (emphasis added)).[9] To enforce its reimbursement rights, Medicare may bring a cause of action against "any or all entities that are or were required or responsible . . . to make payment . . . ." 42 U.S.C.A. § 1395y(b)(2)(B)(iii); *see generally Zinman*, 67 F.3d at 845-46.

¶10      Although eligible persons may still obtain traditional Medicare, in 1997 Congress provided an additional option for Medicare beneficiaries when it enacted Medicare Part C. Balanced Budget Act of

---

or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means." Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301(b)(1)-(2), 117 Stat. 2066 (codified as amended at 42 U.S.C.A. § 1395y(b)(2)(A)(ii), (B)(ii). *See generally Bio-Medical Applications of Tenn., Inc. v. Cent. States Se. and Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 290-91 (6th Cir. 2011) ("[T]he text of [§ 1395y(b)(2)(A)] is addressed to all 'primary plans'—the Act's broadest category of private insurer, . . . which includes 'self-insured plans,' and therefore (after the 2003 amendments) tortfeasors . . . ."); Rick Swedloff, *Can't Settle, Can't Sue: How Congress Stole Tort Remedies from Medicare Beneficiaries*, 41 Akron L. Rev. 557, 583-85 (2008) (discussing the 2003 amendments).

        [9]Although the statute refers to an "entity" rather than a beneficiary, CMS regulations have interpreted "entity" as including "a beneficiary, provider, supplier, physician, attorney, State agency or private insurer." 42 C.F.R. § 411.24(g) (2013). Federal case law also acknowledges that the MSP legislation applies to beneficiaries who have obtained a recovery from a primary payer. *Haro v. Sebelius*, ___ F.3d ___, 2014 WL 21353, at *3 (9th Cir. Jan. 2, 2014) ("The cause of action provision allows the United States to seek reimbursement from 'the beneficiary herself.'" (citing *Zinman*, 67 F.3d at 844-45)).

1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251 (codified as amended at 42 U.S.C.A. §§ 1395w-21 to w-28). Medicare Part C allows eligible individuals to opt out of traditional Medicare and instead obtain both Part A and Part B coverage through private companies approved by CMS, known as Medicare Advantage plans. 42 U.S.C.A. §§ 1395w-21, 1395w-27.

¶11　　　　Medicare Part C was intended to reduce the costs of Medicare to the federal government by "enabl[ing] the Medicare program to utilize innovations that have helped the private market contain costs and expand healthcare delivery options." H.R. Rep. No. 105-149, at 1251 (1997). CMS grants contracts to Medicare Advantage plans based on a bidding system. 42 U.S.C.A. § 1395w-24(a). A Medicare Advantage plan submits a bid based on the estimated costs per enrollee for services covered under Medicare Parts A and B. 42 U.S.C.A. § 1395w-24(a)(1)(A). If the bid is less than the benchmark (the maximum amount Medicare will pay a plan in a particular area), then the Medicare Advantage plan receives a rebate equal to 75% of the difference between the bid and the benchmark, but must use that rebate to provide additional benefits to its enrollees. 42 U.S.C.A. § 1395w-24(b)(1)(C)(i), (b)(3)(C), (b)(4)(C).

¶12　　　　Unlike traditional Medicare, Medicare Part C does not, by itself, require reimbursement or create a private right of action to pursue reimbursement. *See Parra v. PacifiCare of Ariz., Inc.*, 715 F.3d 1146, 1153 (9th Cir. 2013). Instead, the relevant statutory provision, 42 U.S.C.A. § 1395w-22(a)(4) ("Part C authorization provision"), simply allows Medicare Advantage plans to seek reimbursement when other coverage is available. The Part C authorization provision provides:

> Notwithstanding any other provision of law, a [Medicare Advantage plan] may ( . . . under circumstances in which payment under this subchapter is made secondary pursuant to section 1395y(b)(2) of this title) charge or authorize the provider of such services to charge . . . (A) the insurance carrier, employer, or other entity which under such law, plan, or policy is to pay for the provision of such services, or (B) such individual to the extent that the individual has been paid under such law, plan, or policy for such services.

*Id.*[10]

¶13   The reference to § 1395y(b)(2) contained in the Part C authorization provision does not, as Mercy Care Advantage contends, grant Medicare Advantage plans the same right to reimbursement enjoyed under traditional Medicare. The cross-reference simply explains when a Medicare Advantage plan is made secondary to a primary plan and thereby allowed to seek reimbursement -- under the same circumstances as a traditional Medicare plan under § 1395y(b)(2). *Parra*, 715 F.3d at 1154 ("The cross-reference to § 1395y(b)(2)(B)(iii) . . . simply explains when [Medicare Advantage Organization] coverage is secondary to a primary plan . . . that is, under the same circumstances when insurance through traditional Medicare would be secondary.").

II. Preemptive Statutory and Regulatory Framework

¶14   Although the Part C authorization provision does not, by itself, require reimbursement, other provisions of Medicare Part C -- in conjunction with its associated regulations -- grant to Medicare Advantage plans the right to obtain reimbursement from the settlement of claims seeking recovery of medical expenses paid for plan enrollees. And, this right preempts Arizona's anti-subrogation doctrine.

¶15   Determining "[t]he purpose of Congress is the ultimate touchstone" of a preemption analysis. *Altria Group, Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 543, 172 L. Ed. 2d 398 (2008) (alteration in original) (citations omitted) (internal quotation marks omitted). Congress may demonstrate preemptive intent through the express language of a statute. *Id.* When a statute contains an express preemption clause, our "task of statutory construction must in the first instance focus on the plain wording of the clause." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 1737, 123 L. Ed. 2d 387 (1993). The presence of an express preemption clause, however, "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Group, Inc.*, 555 U.S. at 76, 129 S. Ct. at 543.

---

[10]Consistent with the Part C authorization provision, Ethridge's Mercy Care Advantage Plan advised its enrollees that if it paid healthcare costs when other coverage was available, it would seek reimbursement.

¶16   Medicare Part C contains an express preemption provision. It states that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C.A. § 1395w-26(b)(3) ("Part C preemption provision"). The plain wording of the Part C preemption provision evidences Congress's intent that the standards established under Part C preempt state law. And, the legislative history pertaining to this provision further underscores this preemptive intent.

¶17   As first enacted, in 1997, the Part C preemption provision was narrower than it is today; it preempted state law only "to the extent such law or regulation is inconsistent with [the] standards." 42 U.S.C. § 1395w-26(b)(3)(A) (1994 & Supp. IV 1998). It also identified standards that were "specifically superseded." *Id.*[11]

¶18   In 2003, Congress enacted the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066. Because of "some confusion in recent court cases," Congress amended the Part C preemption provision and removed both the "to the extent" language and the listing of specific standards subject to preemption. H.R. Rep. 108-391, at 557 (2003) (Conf. Rep.); *see generally* 42 U.S.C.A. § 1395w-26(b)(3). Congress also added a clause saving only state licensing laws and state laws relating to plan solvency from preemption. 42 U.S.C.A. § 1395w-26(b)(3). The amendment was intended to "clarif[y] that the MA program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Rep. No. 108-391, at 557. The amendment had the effect of broadening the statute's preemptive scope.

¶19   To effectuate the statutorily mandated preemption, in 1997 Congress authorized the Department of Health and Human Services' Secretary to establish standards under Medicare Part C. 42 U.S.C.A. § 1395w-26(b)(1) ("The Secretary shall establish by regulation other standards . . . for [Medicare Advantage] organizations and plans

---

[11]Those "specifically superseded" state standards included benefit requirements, requirements related to the inclusion or treatment of providers, and coverage determinations. 42 U.S.C. § 1395w-26(b)(3)(B) (1994 & Supp. IV 1998).

consistent with, and to carry out, this part.").[12] Although Medicare Part C does not define the term "standard," "at the narrowest cut, a 'standard' within the meaning of the preemption provision is a statutory provision or a regulation promulgated under the Act and published in the Code of Federal Regulations." *Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148 n.20 (9th Cir. 2010). Thus, the regulations promulgated by the Secretary in accordance with this part are standards within the meaning of the Part C preemption provision.[13] And, these regulations "have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153-54, 102 S. Ct. 3014, 3022-23, 73 L. Ed. 2d 664 (1982).

¶20    Pursuant to the Congressional directive, the Secretary promulgated regulations concerning, among other matters, the reimbursement rights of Medicare Advantage plans. 42 C.F.R. pt. 422 (2013). The regulations permit a Medicare Advantage plan to bill "other individuals or entities for covered Medicare services for which Medicare is not the primary payer," 42 C.F.R. § 422.108(c), including "[t]he Medicare enrollee, to the extent that he or she has been paid by the carrier, employer, or entity for covered medical expenses." 42 C.F.R. § 422.108(d)(2).[14] Subsection (f) of the same regulation not only prevents a

---

[12]Aside from a minor revision this language has remained the same since 1997.

[13]The Estate has not argued that the Part C regulations discussed in this opinion are not "standards" within the meaning of the Part C preemption provision.

[14]Subsections (c) and (d) of 42 C.F.R. § 422.108, in full, provide:

(c) Collecting from other entities. The MA organization may bill, or authorize a provider to bill, other individuals or entities for covered Medicare services for which Medicare is not the primary payer, as specified in paragraphs (d) and (e) of this section.

state from "tak[ing] away" a Medicare Advantage plan's right to bill but also -- of critical importance here -- grants to Medicare Advantage plans the *same* right to reimbursement for conditionally paid medical expenses as granted to traditional Medicare:

> Consistent with § 422.402[15] concerning the Federal preemption of State law, the rules established under this section supersede any State laws, regulations, contract requirements, or other standards that would otherwise apply to MA plans. *A State cannot take away an MA*

---

> (d) Collecting from other insurers or the enrollee. If a Medicare enrollee receives from an MA organization covered services that are also covered under State or Federal workers' compensation, any no-fault insurance, or any liability insurance policy or plan, including a self-insured plan, the MA organization may bill, or authorize a provider to bill any of the following—
>
> (1) The insurance carrier, the employer, or any other entity that is liable for payment for the services under section 1862(b) of the Act and part 411 of this chapter.
>
> (2) The Medicare enrollee, to the extent that he or she has been paid by the carrier, employer, or entity for covered medical expenses.

[15]Section 422.402 mirrors the Part C preemption provision, *see supra* ¶ 16, and reads:

> The standards established under this part supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to the MA plans that are offered by MA organizations.

*organization's right under Federal law and the
MSP regulations to bill, or to authorize providers
and suppliers to bill, for services for which Medicare
is not the primary payer. The MA organization
will exercise the same rights to recover from a
primary plan, entity, or individual that the
Secretary exercises under the MSP regulations in
subparts B through D of part 411 of this chapter.*

42 C.F.R. § 422.108(f) (emphasis added).

**¶21**        Relying on 42 C.F.R. § 422.108(d)(2), the Estate argues
§ 422.108(f) provides only the right to bill, and not the right to assert a lien,
claim subrogation, or obtain reimbursement. We disagree. As explained,
*supra* ¶ 20, § 422.108(d)(2) permits a Medicare Advantage plan to bill a
plan enrollee only "to the extent that he or she has been paid by the
carrier, employer, or entity for covered medical expenses." It would be
illogical for the regulations to permit a plan to bill an enrollee, but not to
recover on the bill. The term "bill" necessarily implies payment of the
amount billed. Further, the Estate's argument ignores the last sentence of
§ 422.108(f) which grants a Medicare Advantage plan the same rights to
recover from an individual that federal law grants to traditional Medicare.

**¶22**        The Estate acknowledges Medicare Part C's express
preemption provision but argues it only applies to positive enactments --
statutes and regulations -- and not to state common law. In support of
this argument, the Estate relies on *Sprietsma v. Mercury Marine*, 537 U.S. 51,
123 S. Ct. 518, 154 L. Ed. 2d 466 (2002). In *Sprietsma*, the Supreme Court
analyzed whether an express preemption provision in the Federal Boat
Safety Act ("FBSA") preempted state common law. *Id.* at 55-56, 123 S. Ct.
at 522-23. The preemption provision precluded states from
"establish[ing], continu[ing] in effect, or enforc[ing] a law or regulation . . .
not identical to a regulation prescribed under . . . this title." *Id.* at 58-59,
123 S. Ct. at 524; 46 U.S.C.A. § 4306 (West, Westlaw through P.L. 113-92
(excluding P.L. 113-76, 113-79, and 113-89)). The Court held the
preemption provision only preempted positive state enactments and not
the common law. *Sprietsma*, 537 U.S. at 63-64, 123 S. Ct. at 526-27. In so
holding, the Court explained:

> We think that this language is most naturally
> read as not encompassing common-law claims
> for two reasons. First, the article "a" before
> "law or regulation" implies a discreteness—

> which is embodied in statutes and regulations—that is not present in the common law. Second, because "a word is known by the company it keeps," *Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S. Ct. 1061, 131 L. Ed. 2d 1 (1995), the terms "law" and "regulation" used together in the pre-emption clause indicate that Congress pre-empted only positive enactments. If "law" were read broadly so as to include the common law, it might also be interpreted to include regulations, which would render the express reference to "regulation" in the pre-emption clause superfluous.

*Id.* at 63, 123 S. Ct. at 526. Importantly, the Court also noted that the FBSA contained a savings clause which specifically exempted common law claims from preemption. *Id.*

**¶23** *Sprietsma* does not change our preemption analysis. First, the FBSA's express preemption provision is much narrower than the Part C preemption provision and required a construction of the statute which excluded the common law. The Part C preemption provision, § 1395w-26(b)(3), applies to "*any* State law or regulation" as opposed to "*a* law or regulation." This difference in wording is significant; although "a" "implies a discreteness," "any" is much broader in scope. The Supreme Court has acknowledged that broad phrases within a preemption provision may be understood as encompassing the common law. *See CSX Transp., Inc.,* 507 U.S. at 664-65, 113 S. Ct. at 1737-38 ("any state 'law, rule, regulation, order, or standard'" preempts common law claims); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 522, 112 S. Ct. 2608, 2620, 120 L. Ed. 2d 407 (1992) (federal statute barring additional requirements imposed under state law preempts common law claims).

**¶24** We are also not persuaded that use of the terms "law" and "regulation" together in the Part C preemption provision indicates congressional intent to preempt only positive enactments. We are not required to "avoid surplusage at all costs," *United States v. Atl. Research Corp.,* 551 U.S. 128, 137, 127 S. Ct. 2331, 2337, 168 L. Ed. 2d 28 (2007), and an interpretation of the Part C preemption provision as preempting only positive enactments would contradict the provision's broad language referring to *any* state law.

¶25        Further, unlike the FBSA, Medicare Part C does not include a savings clause to save common law claims from preemption.  Instead, Congress carved out two exceptions to the preemption clause -- state licensing laws and state laws relating to plan solvency -- but did not include an exception for common law doctrines.  42 U.S.C.A. § 1395w-26(b)(3); *see supra* ¶¶ 15-16.  From this, we are persuaded Congress did not intend to exclude state common law from preemption.

¶26        In *Uhm*, the Ninth Circuit Court of Appeals analyzed the scope of a different preemption provision -- one that concerns Medicare Part D[16] -- but which incorporates the Part C preemption provision. The court concluded, as we have, that the preemption provision preempts the common law and that *Sprietsma* does not compel a different conclusion. *Uhm*, 620 F.3d at 1153.  It explained:

> First, . . . [t]he use of "any" negates the "discreteness" that the Court identified in *Sprietsma*.
>
> Second, . . . there is no parallel savings clause in the Act, nor any similar indication that Congress intended to save any common law claims.
>
> Third, . . . we are not convinced that, on its own, . . . —using the word "might"—could justify completely excluding common law claims from the scope of the Act's preemption clause.  Our hesitancy to construe statutes to render language superfluous does not require us to avoid surplusage at all costs.  Moreover, given the tentative nature of *Sprietsma*'s superfluity point—using the word "might"— as well as the key differences we have identified between the FBSA and the Act, we hold that *Sprietsma* does not control here.

*Id.* at 1153-54 (citations omitted) (internal quotation marks omitted).

_____

[16]Medicare Part D is the section of the Medicare Act governing prescription drug coverage.  42 U.S.C.A. § 1395w-101 to -154.

¶27       Finally, the development of the reimbursement regulations by the Secretary also reflects that the Part C preemption provision applies to state common law. In 2004, following the enactment of the Medicare Prescription Drug, Improvement, and Modernization Act, the Secretary submitted for public comment a proposed revision to 42 C.F.R. § 422.402 -- CMS's regulation governing federal preemption of state law generally -- that would "clearly state that the MA standards supersede State law and regulation with the exception of licensing laws and laws relating to plan solvency." Medicare Program; Establishment of the Medicare Advantage Program, 69 Fed. Reg. 46866, 46904 (proposed Aug. 3, 2004) (to be codified at 42 C.F.R. pts. 417, 422).

¶28       After expiration of the public comment period, CMS adopted revised § 422.402, and clarified that "all State standards, including those established through case law, are preempted to the extent that they specifically would regulate MA plans, with the exceptions of State licensing and solvency laws." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4665 (Jan. 28, 2005) (to be codified at 42 C.F.R. pts. 417, 422).[17] CMS reiterated this position in relation to reimbursement specifically in a December 5, 2011 memorandum titled "Medicare Secondary Payment Subrogation Rights." We find it significant that CMS confirmed in this memorandum its "support for [the] regulations giving Medicare Advantage organizations . . . the right, under existing Federal law, to collect for services for which Medicare is not the primary payer." Ctrs. for Medicare & Medicaid Servs.

---

[17]In proposing the revision to § 422.402, CMS noted that "tort law, and often contract law, generally are developed based on case law precedents established by courts, rather than statutes enacted by legislators or regulations promulgated by State officials. We believe that the Congress intended to preempt only the latter type of State standards." Medicare Program; Establishment of the Medicare Advantage Program, 69 Fed. Reg. 46866, 46914 (proposed Aug. 3, 2004) (to be codified at 42 C.F.R. pts. 417, 422). Although the Estate stresses the significance of CMS's initial statement, CMS was not bound to its preliminary view of the scope of Congressional preemption. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 863, 104 S. Ct. 2778, 2792, 81 L. Ed. 2d 694 (1984) ("An initial agency interpretation is not instantly carved in stone."). In fact, "to engage in informed rulemaking, [an agency] must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.* at 863-64, 104 S. Ct. at 2792. As discussed, CMS acknowledged broader preemption when it adopted revised § 422.402.

Memorandum: Medicare Secondary Payment Subrogation Rights (Dec. 5, 2011) (*available at* https://www.cms.gov/Medicare/Health-Plans/HealthPlansGenInfo/downloads/21_MedicareSecondaryPayment.pdf). Accordingly, the reference to "any State law or regulation" in the Part C preemption provision applies equally to state common law.

¶29 Although this issue is a matter of first impression in Arizona, we are not the first jurisdiction to acknowledge the preemptive effect of the Part C preemption provision and its associated regulations concerning the reimbursement rights of Medicare Advantage plans. A New York appellate court and two federal district courts have held that New York's anti-subrogation statute is preempted by Medicare Part C for reasons similar to those discussed here. *See Trezza v. Trezza*, 104 A.D.3d 37, 38, 957 N.Y.S.2d 380 (2012) (concluding New York statute, "is preempted by federal law because it restricts the contractual reimbursement rights to which [Medicare Advantage] organizations are entitled pursuant to the provisions of . . . the Medicare Act"); *Potts v. Rawlings Co., LLC*, 897 F. Supp. 2d 185, 196 (S.D.N.Y. 2012) (finding that "under the plain language of the express preemption provisions of the Medicare Act and its accompanying regulations, [the New York statute] is preempted as it applies to Medicare and MA organization reimbursement rights"); *Meek-Horton v. Trover Solutions, Inc.*, 915 F. Supp. 2d 486, 492 (S.D.N.Y. 2013) (New York statute expressly preempted by plain language of Part C preemption provision and CMS regulations).

¶30 The plain language of the Part C preemption provision demonstrates that Congress expressly preempted all but a very limited number of state laws -- those relating to state licensing and plan solvency, which are expressly not preempted. Arizona's anti-subrogation doctrine does not fall within these exceptions. Because this Arizona doctrine would prevent Medicare Advantage plans from exercising their right under federal law to obtain reimbursement from plan enrollees who have received settlement proceeds that include medical expenses paid by such a plan, it is preempted. Accordingly, Mercy Care Advantage is entitled to seek reimbursement for the medical expenses it paid from the settlement proceeds received by the Estate.[18]

---

[18]The record before us does not reflect whether the Estate and the statutory beneficiaries apportioned the settlement between the APSA claim and the wrongful death claim or, for that matter, allocated any particular portion of the settlement to medical expenses. Further, the

III. *McVeigh* and Other Federal Cases

**¶31** In arguing that Mercy Care Advantage may not obtain reimbursement, the Estate relies on federal cases holding that express preemption provisions are insufficient to confer federal jurisdiction. Specifically, the Estate argues the Supreme Court's decision in *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 126 S. Ct. 2121, 165 L. Ed. 2d 131 (2006), which concerned the Federal Employees Health Benefits Act ("FEHBA"), and decisions of other federal courts concerning federal jurisdiction under Medicare Parts C and D, are "virtually identical" to this case, and thus should guide our decision. Those cases are not controlling here.

**¶32** The issue in *McVeigh* was whether the express preemption clause, 5 U.S.C.A. § 8902(m)(1), of the FEHBA provided a basis for federal question jurisdiction over reimbursement disputes. In holding it did not, the Court noted the FEHBA contained no provision regarding reimbursement or subrogation rights and so the right to reimbursement arose from the contract and not the FEHBA. The Court also found no indication of Congressional intent to completely "displace ordinarily applicable state law, and to confer federal jurisdiction thereby." *Id.* at 680, 126 S. Ct. at 2125.

**¶33** Unlike the FEHBA, Medicare Part C and its associated regulations contain provisions regarding reimbursement and subrogation rights. And, as discussed *supra* ¶¶ 12-13, 19-21, 23, Congress intended Medicare Part C and its associated regulations to preempt "*any* State law," which includes Arizona common law. (Emphasis added.) Finally, the *McVeigh* Court specifically declined to decide whether § 8902(m)(1) superseded state laws governing subrogation and reimbursement. *Id.* at 697-98, 126 S. Ct. at 2135; *see generally Kobold v. Aetna Life Ins. Co.*, 233 Ariz. 100, 103, ¶ 8, 309 P.3d 924, 927 (App. 2013).

---

parties did not ask the superior court to address the extent of Mercy Care Advantage's right to reimbursement under the settlement if federal law preempted Arizona's anti-subrogation doctrine. Accordingly, on remand, the superior court may consider these matters and this issue. We express no opinion regarding the extent to which Mercy Care Advantage is entitled to reimbursement.

¶34 The issue in the other federal cases cited by the Estate was whether the Medicare Parts C and D reimbursement provisions granted Medicare Advantage plans a cause of action in federal court to seek reimbursement for medical expenses conditionally paid for a plan enrollee. *See Parra*, 715 F.3d at 1153; *Nott v. Aetna U.S. Healthcare, Inc.*, 303 F. Supp. 2d 565, 571 (E.D. Pa. 2004); *Care Choices HMO v. Engstrom*, 330 F.3d 786, 791 (6th Cir. 2003). Those decisions held the reimbursement provisions did not grant such a cause of action and such claims must be pursued in state court. As Mercy Care Advantage points out, those decisions did not address the viability of reimbursement claims in state court, which is the issue in this case.

IV. Attorneys' Fees and Costs

¶35 Mercy Care Advantage requests an award of attorneys' fees on appeal under A.R.S. § 12-341.01(A) (Supp. 2013). Because the preemption issue presented here is a matter of first impression, in the exercise of our discretion, we deny the request. *See Orlando v. Superior Court*, 194 Ariz. 96, 99, ¶ 14, 977 P.2d 818, 821 (App. 1998) (request for attorneys' fees denied because case involved issue of first impression and parties did not act frivolously or unjustifiably). We nevertheless award Mercy Care Advantage its costs on appeal subject to its compliance with Rule 21 of the Arizona Rules of Civil Appellate Procedure. *See* A.R.S. § 12-342 (2003).

## CONCLUSION

¶36 For the foregoing reasons, we reverse the superior court's grant of judgment on the pleadings and remand for further proceedings consistent with this opinion.



Ruth A. Willingham · Clerk of the Court
FILED: MJT