IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR KENT COUNTY

JEAN F. HONEY,                               :
                                             :        C.A. No: K13C-05-018 RBY
_____Plaintiff,                    :
                                             :
      v.                                     :
                                             :
BAYHEALTH MEDICAL CENTER, INC.,              :
a Delaware corporation, and                  :
ERIC M. HITCHCOCK, D.O.,                     :
                                             :
            Defendants.                      :


*Submitted: July 17, 2015*
*Decided: July 28, 2015*


***Upon Consideration of Defendants' Motion in Limine to
Preclude Plaintiff from Introducing Medical Expenses Exceeding
Amounts Actually Paid or Payable by Medicare***
**GRANTED**


**ORDER**

William D. Fletcher, Jr., Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware for Plaintiff.

James E. Drnec, Esquire, and Melony R. Anderson, Esquire, Balick & Balick, LLC, Wilmington, Delaware for Defendant Bayhealth Medical Center, Inc.

Bradley J. Goewert, Esquire, and Lorenza A. Wolhar, Esquire, Marshall Dennehey Warner Coleman & Goggin, Wilmington, Delaware for Defendant Eric M. Hitchcock, D.O.


Young, J.

## SUMMARY

The Delaware Supreme Court in *Stayton v. Delaware Health Corp.*,[1] recently determined limits of the collateral source rule regarding healthcare bill amounts written-off by medical providers, where the injured party is covered by Medicare. The *Stayton* Court held that an injured Plaintiff's damages stemming from the costs of medical treatment are limited to amounts actually paid by Medicare, rather than the amounts billed to Medicare.

During the Supreme Court's consideration of that issue, Bayhealth Medical Center, Inc. ("Defendant Bayhealth") and Dr. Eric M. Hitchock ("Defendant Dr. Hitchock," and, together with Bayhealth "Defendants") filed a motion in limine in the case at bar, seeking to prevent Jean F. Honey ("Plaintiff"), a Medicare Advantage enrollee, from presenting evidence of medical expenses above that which her Medicare Advantage insurer, Bravo Health, Inc. ("Bravo Health") actually paid. Given the pending case before the Supreme Court, which concerned the Medicare issue, the Court stayed consideration of Defendants' motion.

Although the Supreme Court's ruling resolves the question regarding the collateral source rule and Medicare write-offs, it does not specifically address situations in which a plaintiff is enrolled in a Medicare Advantage plan, such as the one administered by Bravo Health. This case requires determination as to whether the Plaintiff in the case at bar was insured under traditional Medicare, and, thus, is subject to *Stayton*'s limitation on the collateral source rule, or was

---

[1] 2015 WL 3654325, at *1 (Del. Jun. 12, 2015).

2

instead covered by a private health insurer.

For the reasons that follow, the Court finds that Bravo Health, and other Medicare Advantage insurers are within the larger Medicare system. Thus, Plaintiff was insured by Medicare, and the Court **GRANTS** Defendants' motion, consistent with the Supreme Court's directive in *Stayton.*

## FACTS AND PROCEDURES

On March 1, 2012, Plaintiff underwent a laparoscopic cholecystectomy at Bayhealth's Milford Memorial Hospital, performed by Defendant Dr. Hitchcock. Plaintiff alleges that the surgery resulted in a urinary bladder laceration, leading to further complications from an undetected post-operative intra-abdominal hemorrhage. Defendant Dr. Hitchock's negligent conduct in performing the surgery, is purported to be the cause of Plaintiff's injuries. Plaintiff claims she suffered from immense pain and suffering, as well as having endured injuries to her gastrointestinal and urinary systems.

On May 16, 2013, Plaintiff filed an action sounding in medical negligence against Defendant Dr. Hitchcock and Defendant Bayhealth. Plaintiff's Complaint alleges $217,437.50 in damages stemming from the treatment of Plaintiff's injuries, and that she will incur greater medical expenses in the future. At the time of Plaintiff's surgery, she was enrolled in a Medical Advantage program administered by Bravo Health. Bravo Health is alleged to have covered the cost of these healthcare charges.

On November 5, 2014, Defendants' filed a motion in limine to exclude

medical expenses exceeding the amount actually paid by Bravo Health.[2] By Order dated January 23, 2015, this Court stayed consideration of that motion pending the Delaware Supreme Court's decision in *Stayton*. The Supreme Court issued its decision on June 12, 2015. By letter dated June 15, 2015, this Court invited the parties to submit supplemental briefing concerning the previously stayed motion.

## DISCUSSION

In *Stayton*, the Supreme Court was faced with the question of whether the collateral source rule should be extended to situations in which a plaintiff's medical care is covered by Medicare. The Supreme Court answered this query in the negative. The significance of this for the instant matter is that Plaintiff was enrolled in a Medicare Advantage program, also know as "Part C," which was administered by Bravo Health. The added complexity here, however, is that there exists some controversy as to whether Medicare Advantage is part of the traditional Medicare system, or, is instead, more like a private health insurer.[3] During the pendency of the stay, the Court requested that the parties fully brief this issue.[4] Having both the Supreme Court's decision, and the parties' respective positions concerning the nature of Medicare Advantage, the Court may now proceed with disposition of Defendants' motion.

---

[2] The motion was filed by Defendant Dr. Hitchcock and was joined by Defendant Bayhealth on November 19, 2014.

[3] *See e.g.,* D. Gary Reed Esq., *Medicare Advantage Misconceptions Abound*, 27 No.1 Health Law 1 (2014).

[4] *See* Court's Letter, dated January 5, 2015.

By Delaware jurisprudence, the collateral source rule provides that tortfeasors are forbidden the windfall arising from a third-party covering the expense of the injured party's potential damages.[5] Within the context of medical treatment, in some circumstances, the collateral source rule has prevented amounts written-off by medical providers from reducing plaintiffs' awards.[6] That is, plaintiffs have been permitted, in those circumstances, to recover the full amount charged for medical care, rather than the amount actually paid. That philosophy has been applied to situations where a plaintiff pays for the medical services himself, and to situations where a plaintiff is insured by a private entity, covering the cost of medical care.[7]

However, with respect to plaintiffs insured by Medicare, the *Stayton* decision has stated otherwise:

> We conclude that the collateral source rule does not apply to amounts required to be written off by Medicare. Where a healthcare provider has treated a plaintiff covered by Medicare, the amount paid in medical services is the amount recoverable by the plaintiff as medical expense damages.[8]

The holding is clear. Any amounts not actually paid by Medicare are not recoverable as damages by the Plaintiff. Had the Plaintiff in the case at bar been covered by traditional Medicare, the inquiry would end there. Instead, Plaintiff was enrolled in

---

[5] *Stayton,* 2015 WL 3654325 at *4.

[6] *Id.,* at *6.

[7] *Onusko v. Kerr*, 880 A.2d 1022 (Del. 2005)(as applied to plaintiff covering his own medical expenses); *Mitchell v. Haldar*, 883 A.2d 32 (Del. 2006)(as applied to medical expenses covered by private health insurer).

[8] *Stayton,* 2015 WL 3654325 at *1.

a Medicare Advantage plan administered by Bravo Health. The Court must, therefore, determine whether Medicare Advantage is considered part of the traditional Medicare program, or treated as a private carrier. If part of the Medicare program, then the collateral source rule does not apply.

Some jurisdictions have viewed Medicare beneficiaries who choose to enroll in a Medicare Advantage program as "opting out" of traditional Medicare.[9] Such a depiction speaks to Medicare Advantage as something removed from traditional Medicare. Others, by contrast, view Part C as well within the Medicare scheme.[10] As

---

[9] *See e.g., Sunshine Haven Nursing Operations, LLC v. United States HHS*, 742 F.3d 1239, 1258 n. 2 (10th Cir. 2014) ("Part C allows eligible participants to opt out of traditional Medicare and instead obtain various benefits through [private insurers called Medicare Advantage organizations]"; *Parra v. Pacificare of Ariz., Inc.*, 715 F.3d 1146, 1152-1153 (9th Cir. 2013) ("Part C allows eligible participants to opt out of traditional Medicare and instead obtain various benefits through MAOs"); United States ex rel. *Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 300 n. 3 (3d Cir. 2011) ("opt out of traditional fee-for-service coverage under Medicare Parts A and B and enroll in privately-run managed care plans"); *First Med. Health Plan, Inc. v. Vega-Ramos*, 479 F.3d 46, 47 (1st Cir. 2007) ("opt out of traditional fee-for-service coverage"); *Born v. Sebelius*, 968 F. Supp. 2d 1109, 1113 (D. Colo. 2013) ("allows eligible participants to opt out of the traditional Part A fee-for-service system and instead obtain various benefits through Medical Advantage Organizations"); *Mann v. Reeder*, 2010 WL 5341934, *3 (W.D. Ky. Dec. 21, 2010) ("opt out of traditional coverage under Medicare Parts A and B"); *Bolden v. Healthspring of Ala., Inc.*, 2007 WL 4403588, *7 (S.D. Ala. Oct. 2, 2007) ("to opt out of the traditional fee-for-service coverage under Parts A and B"); *Estate of Ethridge v. Recovery Mgmt. Sys.*, 326 P.3d 297, 301 (Ariz. Ct. App. 2014) ("to opt out of traditional Medicare and instead obtain both Part A and Part B coverage through private companies approved by CMS").

[10] *See e.g., U.S. v. Lopez-Diaz*, 940 F. Supp. 2d 39, 47 (D.P.R. 2013) ("Defendant JLD argues that he only submitted bills 'to privately owned insurance companies, which pay from private funds and not from Medicare funds. The government's evidence of over 1,700 'CMS 1500 claims forms,' however, show that defendant JLD submitted billing claims to Medicare Advantage Plans. A Medicare Advantage Plan ("MAP") is a type of Medicare health plan offered by a private company that contracts with Medicare to provide beneficiaries with Medicare benefits. Beneficiaries who participate in these plans *still benefit from Medicare via Part C of the*

to the former approach, those few legal scholars who have considered the subject, almost unanimously, reject it, claiming a widespread judicial misunderstanding of the operation of the Medicare system.[11] The parties, in their respective briefing of the issue, focus upon both the composition and operation of Medicare Advantage programs, highlighting such features as the payment of benefits, relationships with medical providers, and recovery rights against tortfeasors who injure enrollees.

It is helpful to map out the structure of the Medicare system, noting that the Medicare Act has been described as "one of the most completely impenetrable texts within human experience."[12] Most relevant to our inquiry, Medicare includes Part A and Part B, the "traditional" Medicare, or "pay-per-service" Medicare, which is government-administered. It includes also Part C, known as the Medicare Advantage option, in which private organizations ("Medicare Advantage Organization," or,

---

*Medicare program.*") (emphasis added); *Pagarigan v. Superior Court*, 102 Cal. App. 4th 1121, 1133 (Cal. App. 2d Dist. 2002) ("Here, however, the 'dealings' are not between an insurer and its policyholder, but rather, between Medicare (the federal government) and Medicare beneficiaries through the intermediary of Medicare health care service plans contracted with the federal government to provide Medicare benefits").

[11] *See e.g.,* Reed, *supra*; Jennifer Jordan, *Is Medicare Advantage Entitled to Bring a Private Cause of Action Under the Medicare Secondary Payer Act?*, 41 Wm. Mitchell L. Rev. 1408 (2015); Eileen Kuo, *Medicare Advantage: Medicare or "Private" Insurance? Developments in Medicare Secondary Payer Law*, 2013 Health L. Handbook § 12:5; *But see* Elizabeth C. Borer, *Modernizing Medicare: Protecting American's Most Vulnerable Patients From Predatory Health Care Marketing Through Accessible Legal Remedies,* 92 Minn. L. Rev. 1165 (2008) (viewing Medicare Advantage option as part of growing effort to *privatize* the Medicare system).

[12] *Parra*, 715 F.3d at 1149.

"MAO") administer benefits to enrollees.[13] Part C, added to the Medicare system after the Act's initial passage, was intended to "harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system."[14] Congress sought to achieve this goal, by implementing a program, wherein the government would pay private health insurers a flat rate per enrollee to administer and provide the same basic benefits received under traditional Medicare.[15] Pursuant to this scheme, the MAO pays providers directly for the care received by Part C enrollees. To the extent that this care exceeds the flat rate received from the government, the MAO assumes the risk and cost.[16] In the event the care costs less than the flat rate received, the MAO is permitted to keep the difference as profit.[17]

The statutory scheme further reflects a closely regulated MAO operation. To be approved to be an MAO, the private insurer must enter a bidding process, meeting certain threshold requirements.[18] MAOs must be licensed in each State in which they operate.[19] MAOs must offer an "explanation of coverage" annually, approved by the

---

[13] *In re Avandia Mtking., Sales Practices & Prods. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012), *cert. denied*, 133 S.Ct. 1800 (2013).

[14] *Id.,*at 363.

[15] Jordan, *supra* at 1412-13; 42 U.S.C § 1395W-23 (2015); 42 U.S.C § 1395W-22 (2015).

[16] Jordan, *supra* at 1413.

[17] *Id.*

[18] *Id.*

[19] Jordan, *supra* at 1414; 42 U.S.C. § 1395W-25(a)(1) (1997) .

Centers for Medicare & Medicaid ("CMS") to enrollees.[20] In providing the basic benefits offered to traditional Medicare enrollees, MAOs are constrained by, and must abide by, national coverage determinations provided by CMS.[21] In addition, all coverage disputes between enrollees and MAOs must go through the traditional Medicare appeals process.[22] The decisions coming out of the Medicare appeals process are, moreover, binding upon the MAO.[23] There is some discretion given MAOs, however, with respect to the provision of services, to wit, the ability to control how enrollees get said services, as well as the ability to establish networks of accepted healthcare providers.[24]

In establishing their respective positions, the parties cite to and employ several of the above referenced considerations, in their supplemental briefing. Plaintiff focuses primarily upon the discretionary aspects of an MAO's operation, including the ability to determine to some degree the provision of, and payment for services, as well as the independent relationships established between MAOs and healthcare providers. Plaintiff also notes the fact that MAOs, such as Bravo Health, are privately established entities, having the ability to be bought and sold by private actors. The

---

[20] Jordan, *supra* at 1414; 42 C.F.R. § 422.111 (2015).

[21] 42 C.F.R § 422.101(b).

[22] Jordan, *supra* at 1413; 42 C.F.R § 405.904(a); *Weinberger v. Salfi*, 422 U.S. 749, 760-761 (1975).

[23] Reed, *supra* at *7 (citing 42 C.F.R. § 422.576 (organizational determination); 42 C.F.R. § 422.596 (reconsideration); 42 C.F.R. § 405.1048 (ALJ decision); 42 C.F.R. § 405.1130 (Medicare Appeals Counsel decision)).

[24] Jordan, *supra* at 1414.

Court understands this point to mean that Bravo Health is not a mere appendage of the Federal government, having the ability to make decisions about its existence and governance internally, outside of federal oversight. Defendants, meanwhile, direct the Court's attention to the federal constraints and federal watchful eye, under which MAOs operate, pointing to the intensive regulatory framework surrounding Part C.

Although there are both discretionary and regulated aspects to an MAO's operation, the latter certainly outweigh the former. This is particularly evident in the framework within which the private health insurers administering Part C coverage exist. The federal government established the Medicare system and, subsequently, made the decision to allow private insurer's into it. It is the federal government which sets the fixed rate at which MAOs will be remunerated. Likewise, the federal government establishes the basic services that each Part C private insurer participant must provide. These private health insurers are, further, constrained in their ability to deny coverage, limited to the decisions of federally anointed adjudicators. The discretion permitted these private insurers is *within* this federally created framework – not outside or even alongside it.

That the insurer is allowed to establish relationships with medical providers, or to make payments on behalf of *Medicare* enrollees, does not create the discretion pointing to an independent, private insurance plan. Many of these private insurers offer insurance policies that are outside of the Medicare scheme.[25] The main

---

[25] For example, Bravo Health, the insurer in the case at bar, is now owned by Humana, Inc., a private health insurer that provides both Medicare Advantage, as well as private plans for individuals and businesses. *See Company Profile and Get to Know Humana*, HUMANA.COM, https://www.humana.com/about/company-profile/(last visited Jul. 23, 2015).

distinction is that in those private plans, the contract to provide insurance coverage is between the insured and the insurer. Under Part C, the contract is between the federal government and the insurer.[26] Therefore, the defining factor of a truly private insurance plan, one between insured and a insurer, is lacking.[27] Of great significance is that these contracts define the rights of insurers vis-à-vis their insureds. Among the things contained in such contracts are provision of services and when such services will be denied. Such basic determinations are out of the administrator's hands in Part C coverage – being decided instead by the other party to the contract – the federal government.[28] Hence, this is a federal contractor providing federal benefits,

---

[26] Kuo, *supra* at § 12:5 ("MAOs provide the same benefits as would be provided under Medicare Parts A and B and provides them pursuant to their *contracts with CMS*"); Reed, *supra* at *3("*Part C contractors administer Medicare benefits under their contract with the federal government and under federal law*")(emphasis in original).

[27] *Id.* ("MAOs do not issue a Medicare 'insurance policy' but, rather, send out a document describing the Medicare benefits that enrollees receive. They do not pay benefits pursuant to a 'policy' but rather under a statutory framework"); Reed, *supra* at *6-*7 ("[t]here is no such thing as a [M]edicare Advantage policy. To elect a Medicare Advantage Plan, Medicare beneficiaries do not complete an insurance application. To leave a Medicare Advantage plan, the Medicare Advantage enrollee does not terminate or cancel an insurance policy...If a Medicare Advantage enrollee does not receive benefits...they may not sue for breach of contract or for bad faith refusal to pay benefits under an insurance policy").

[28] Jordan, *supra* at 1412-13 (MAOs must provide the same basic benefits as traditional Medicare); Kuo, *supra* at § 12:5 ("MAOs must provide their enrollees copies of their Evidence of Coverage describing, among other items, the benefits provided under Original Medicare as well as any supplemental benefits offered by the MAO and the grievance and appeals procedures. *Any changes to the Evidence of Coverage must be approved by CMS*")(emphasis added); Reed, *supra* at *7 ([benefit eligibility pursuant to Medicare appeals process] determination is binding on the Medicare Advantage organization").

established by the federal government, to federal constituents.[29] Consistent with the rationale of *Stayton*, the Court finds that the determination of Medicare Advantage as within the broader Medicare system, rather than as a private insurance plan, is called for.

With these recovery rights in mind, it is helpful to review the rights attributed to MAOs and from whence they come. Recent decisions, beginning with the Third Circuit Court of Appeal's opinion in *In re Avandia Mtkg.*, have held that as regards recovery of medical expenses by Part C insurers, stemming from torts, the recovery rights arise out of the Medicare Act.[30] That is, MAOs have their recovery rights determined statutorily, just as traditional Medicare.[31] Specifically, courts have found that 42 U.S.C. § 1395y(b)(3)(A) provides a private right of action for MAOs to recover medical expenses paid on behalf of enrollees.[32] This finding of a *statutory* right of recovery was made in juxtaposition to the argument that the right of recovery is determined *contractually* in a MAO's policy.[33] As has been noted previously,

---

[29] Reed, *supra* at *7-*8 (explaining that private insurers participating in Part C are federal contractors, just like the many other contractors who perform delegated tasks by CMS in traditional Medicare).

[30] 685 F.3d 353 (3d Cir. 2012); *Collins v. Wellcare Health Plans, Inc.*, 2014 WL 7239426, at *1 (E.D. La. Dec. 16, 2014); *Humana Med. Plan, Inc. v. Western Heritage Ins. Co.*, 2015 WL 1191208, at *1 (S.D. Fla. Mar. 16, 2015).

[31] *Avandia*, 685 F.3d 353.

[32] *Avandia*, 685 F.3d 353; *Collins*, 2014 WL 7239426 at *1; *Humana Med. Plan, Inc.*, 2015 WL 1191208 at *1.

[33] *Avandia*, 685 F.3d at 361 (describing the opponent's argument "[i]nstead, such [MAO recovery] rights can be secured by the MAO's contract with an individual insured; that is, the insurance policy"); *see also* Kuo *supra* § 12:5 ("By the same token, MAOs do not exercise the

"[t]here is no such thing as a [M]edicare Advantage insurance policy."[34] Medicare Advantage is, instead, a *federal* program.

The significance of these decisions, announcing a private right of recovery by Part C private insurers under the Medicare Act, is that they further support the contention that Medicare Advantage is more akin to traditional Medicare, than a private health insurance plan. Moreover, *Stayton* focused upon the difference between the recovery rights of Medicare and private insurers. If an MAO's right is defined statutorily by the Medicare Act, than the same concern of Medicare's not having a subrogation right to written-off portions of the healthcare bill applies to an MAO. The imbalance surrounding the potential windfall to Plaintiff, if the collateral source rule were extended to MAOs would, under *Stayton*, still exist: "[i]f the collateral source rule was employed to allow a plaintiff [covered by Medicare] to recover the full cost of medical treatment she received for free...the rule would perversely provide for a windfall for plaintiff, rather than fairly allocate an award of expenses to the *party that actually incurred them*."[35] Here, Plaintiff, like the *Stayton* Plaintiff, paid for nothing.

The reasoning of the *Avandia* line of cases is further consistent with the Supreme Court's ruling in *Stayton*, given the similar policy considerations underlying these two sets of decisions. In rejecting the extension of the collateral source rule to written-off portions of medical care that was paid for by Medicare, the Supreme Court

power to include 'subrogation rights' in their policies– rather, MAOs' rights as secondary payers are *statutory*")(emphasis added).

[34] Reed, *supra* at *6.

[35] *Stayton*, 2015 WL 3654325 at *12 (Strine, C.J., concurring).

noted that, rather than benefitting the injured party, discounted healthcare charges are a boon to "federal taxpayers."[36] Such is not the purpose of the collateral source rule, nor was it intended to operate this way.[37] Similarly, the *Avandia* Court, in finding that an MAO has a private right of action to recover payments made on behalf of an enrollee for medical care, deemed its ruling in line with the Congressional intent behind creating the Medicare Advantage option, which was to save costs: "[a]ccordingly, when MAOs spend less on providing coverage for their enrollees, as they will if they recover efficiently from primary payers, the Medicare Trust Fund does achieve cost savings."[38] Again, we see that the financial benefit surrounding Medicare recovery rights goes to the taxpayer – not the injured party. Therefore, an MAO is squarely within the traditional Medicare system, advocating against an extension of the collateral source rule to Part C enrollees.

The Medicare Advantage is part of the larger Medicare system, rather than an independent, private insurance plan. Therefore, as a component of Medicare, Plaintiff's damages stemming from medical expenses are limited to amounts actually paid for by his MAO, here Bravo Health.

---

[36] *Id.,* at *9.

[37] *Id.,* at *9 ("based on quasi-punitive nature of tort law liability" collateral source rule is intended to benefit the Plaintiff, at the expense of Defendant/Tortfeasor)(internal quotations omitted).

[38] 685 F.3d at 365.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion in limine is **GRANTED**.

**IT IS SO ORDERED**.

                           /s/ Robert B. Young

                                     J.

RBY/lmc
oc:    Prothonotary
cc:    Counsel
        Opinion Distribution