IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DIANE L. STAYTON, | § | |
| | § | No. 601, 2014 |
| Plaintiff Below- | § | |
| Appellant, | § | |
| | § | |
| v. | § | Court Below – Superior Court |
| | § | of the State of Delaware, in and |
| DELAWARE HEALTH CORPORATION, | § | for Kent County |
| a Delaware Corporation; HARBOR | § | |
| HEALTHCARE CENTER COMPANY, | § | C.A. No.: K12C-04-026 RBY |
| L.L.C., a Limited Liability Company; | § | |
| MARY FRANCIS DRANDORFF, RN, | § | |
| Individually; RUTHANNE ROBERTS | § | |
| JACOBS, RN, Individually; and RENEE | § | |
| L. WOZNICKI EDGE, RN, Individually, | § | |
| | § | |
| Defendants Below- | § | |
| Appellees. | § | |

Submitted: May 6, 2015
Decided: June 12, 2015

Before **STRINE**, Chief Justice, **HOLLAND**, **VALIHURA, VAUGHN** and **SEITZ**, Justices; constituting the Court *en Banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

William D. Fletcher, Jr., Esquire, Schmittinger and Rodriguez, P.A., Dover, Delaware, for Appellant Diane L. Stayton.

Norman H. Brooks, Jr., Esquire, Marks, O'Neill, O'Brien, Doherty & Kelly, P.C., Wilmington, Delaware, for Appellees.

**SEITZ**, Justice:

# I.    INTRODUCTION

The plaintiff, Diane Stayton, sustained serious burn injuries while a resident at Harbor Healthcare and Rehabilitation Center ("Harbor Healthcare"), a skilled nursing center in Lewes, Delaware. She brought a medical negligence suit against those responsible for her care at Harbor Healthcare. In addition to general damages, Stayton sought special damages for the cost of her medical care after she was burned. Absent Medicare coverage, the burn hospital and other providers who treated her for her injuries would have billed Stayton $3,683,797.11. Because Stayton qualifies for Medicare, the Centers for Medicare and Medicaid Services ("CMS") paid Stayton's healthcare providers $262,550.17 in full satisfaction of the expense of Stayton's hospital stay and other care. Medicare regulations required the write-off of $3,421,246.94, and Stayton's healthcare providers could not "balance bill" her for the amount written off.

The defendants moved for judgment on the pleadings seeking judgment as a matter of law that Stayton's medical expense damages were limited to the amount actually paid by CMS, rather than the amount Stayton might have been billed for her care. Stayton opposed the motion, relying on the collateral source rule. Stated generally, the collateral source rule provides that if an injured party is compensated for injuries from a source independent of the tortfeasor, the payment is not admissible to limit the damages paid by the tortfeasor. Application of the rule in

this case to the amount Stayton's healthcare providers wrote off would mean Stayton could introduce into evidence as potential special damages the amount her healthcare providers might have billed ($3,683,797.11), instead of the amount actually paid ($262,550.17).

The Superior Court granted the defendants' motion, and limited Stayton's medical expense claim to the amount paid by CMS. The court decided that the collateral source rule did not apply to amounts required by federal law to be written off by healthcare providers. We accepted certification of an interlocutory appeal under Supreme Court Rule 42 from the Superior Court's decision.

On appeal, Stayton argues that the Superior Court should have applied the collateral source rule to the Medicare write-offs. We conclude that the collateral source rule does not apply to amounts required to be written off by Medicare. Where a healthcare provider has treated a plaintiff covered by Medicare, the amount paid for medical services is the amount recoverable by the plaintiff as medical expense damages.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

According to the allegations of the complaint, at the time of the accident, Stayton was a 76 year-old resident of the Harbor Healthcare and Rehabilitation Center. She was wheelchair bound, paralyzed in one of her arms and one of her legs, and had also suffered from a stroke. While unsupervised, she attempted to

3

light a cigarette and caught her clothing on fire. Stayton was burned over twenty three percent of her body, requiring treatment by over thirty physicians and other healthcare providers during her nearly six month hospital stay at Crozer Burn Center in Chester, Pennsylvania.

Stayton alleges that defendants' medical negligence caused her injuries. The hospital and her other healthcare providers billed a total of $3,683,797.11, representing the amount that would be billed to Stayton absent Medicare coverage.[1] The same bill summary shows that Medicare through CMS paid the providers $262,550.17 in full satisfaction of all healthcare provider charges.[2]

Medicare is a government-sponsored health insurance program for people 65 years old or older who are eligible for Social Security retirement benefits.[3] The program is largely funded through taxes paid by employers and employees under the Federal Insurance Contributions Act.[4] Beneficiary participation is involuntary.[5] Many eligible beneficiaries receive benefits directly from the federal government,

---

[1] App. to Opening Br. at 43-54 (Complaint Exhibit A).
[2] *Id.* at 54.
[3] 42 U.S.C. § 1395c.
[4] 26 U.S.C. §§ 310(b), 3111(b).
[5] Participation on the part of health care providers is by agreement. *See* 42 U.S.C. § 1395cc(a)(1) (providing that "any provider of services . . . shall be qualified to participate [in Medicare] and shall be eligible for payments . . . if it files with the Secretary an agreement" and specifying the terms of the agreement).

4

but some elect to receive their benefits through private insurance companies that contract with the Government to provide "Medicare+Choice" plans.[6]

When a healthcare provider like Crozer Burn Center delivers medical services to a patient covered under Medicare, the provider must submit its bill to the Medicare agency for reimbursement.[7] The provider cannot seek reimbursement for its medical services from anyone other than Medicare.[8] Medicare pays, on average, less than one-third of a patient's medical expenses.[9] The healthcare provider is required to write off the remaining balance, and it cannot collect any further payments on that amount.[10] Under the Medicare as Secondary Payer Act, the Medicare Trust Fund can place a lien on any tort recovery by the patient in the amount of the benefits actually paid, minus a portion of the litigation costs.[11]

The defendants moved for judgment on the pleadings under Superior Court Civil Rule 12(c) to limit Stayton's past medical expense damages to the

---

[6] 42 U.S.C. § 1395w-21(a)(1).

[7] 42 USC § 1395cc(a)(1)-(2). Providers may charge Medicare patients applicable deductibles and coinsurance.

[8] *Id.*

[9] Stephen L. Olson & Pat Wasson, *Is the Collateral Source Rule Applicable to Medicare and Medicaid Write-Offs*, 71 DEF. COUNS. J. 172, 172 (2004) (citing *Confronting the New Health Care Crisis: Improving Health Care Quality and Lowering Costs by Fixing Our Medical Liability System*, U.S. Dep't of Health and Human Services, July 24, 2002).

[10] 42 U.S.C. § 1395cc(a)(1)-(2); 42 C.F.R. § 489.21(a).

[11] *Id.* at § 1395y(b)(2)(B)(iii); 42 C.F.R. § 411.37(c) ("If Medicare payments are less than the judgment or settlement amount, the recovery is computed as follows: (1) Determine the ratio of the procurement costs to the total judgment or settlement payment. (2) Apply the ratio to the Medicare payment. The product is the Medicare share of procurement costs. (3) Subtract the Medicare share of procurement costs from the Medicare payments. The remainder is the Medicare recovery amount.").

$262,550.17 paid to Stayton's healthcare providers by CMS. They argued that the written-off portion of the claim was not recoverable because neither Medicare nor Stayton would be required to pay it and Crozer Burn Center and Stayton's other providers would never collect it. In response, Stayton contended that she was entitled to the entire amount billed by Crozer Burn Center and her other providers, including the written-off portions of her bills, because under the collateral source rule, an injured party is permitted to recover the full reasonable cost of medical services from the tortfeasor, and a tortfeasor may not benefit from payments that the victim receives from third parties.

Although this Court recognized the collateral source rule as a "firmly embedded" principle of Delaware law in *Mitchell v. Haldar*,[12] the Superior Court distinguished benefits received as a consequence of a contract with a private insurer from benefits received under operation of federal law. The Superior Court relied on our decision in *State Farm Mutual Auto Insurance Company v. Nalbone*, which held that the plaintiff was not allowed to seek a damage award that included compensation for lost wages when she was receiving reimbursement for those losses from her employer's disability plan.[13] The Superior Court found that *Nalbone* qualified the collateral source rule by requiring the court to examine the

---

[12] *Mitchell v. Halder*, 883 A.2d 32, 37 (Del. 2006) (quoting *Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del. 1964)).

[13] *State Farm Mut. Auto Ins. Co. v. Nalbone,* 569 A.2d 71 (Del. 1989).

6

consideration that had been paid by the plaintiff before awarding a double recovery. "[I]f a Plaintiff has paid consideration for recovery from a collateral source," the Superior Court reasoned, "then the double recovery is permissible."[14] But because Stayton "did not contract with her health provider to accept reduced payments from Medicare for her medical expenses," the court found the collateral source rule did not apply.[15]

After examining several cases addressing the question of whether the full amount of medical expenses, including amounts paid for by collateral sources, could be recovered in a damages action, the Superior Court decided to follow a Superior Court case, *Rice v. The Chimes, Inc.*[16] In *Rice*, the plaintiff sustained burn injuries that were also treated at Crozer. Crozer submitted charges of $883,000 to Medicare, and Medicare paid $59,000, requiring Crozer to write-off the remaining $824,000. In finding that the plaintiff could only recover $59,000, the amount paid by Medicare, the Superior Court reasoned that the collateral source rule did not apply to expenses that are never paid. It concluded that "healthcare debt is simply extinguished by operation of law when the healthcare provider elects to accept payment of assigned benefits directly from Medicare."[17]

---

[14] *Stayton v. Delaware Health Corp.*, 2014 WL 4782997, at *2 (Del. Super. Sept. 24, 2014) (internal quotations omitted).
[15] *Id.*. at *1.
[16] *Rice v. The Chimes, Inc.*, C.A. No. 01-03-260 CLS (Del. Super. Oct. 4, 2002).
[17] *Id.* at 4 (quoting *Wildermuth v. Staton*, 2002 WL 922137, at *5 (D. Kan. April 29, 2002)).

The Superior Court concluded that Stayton could only recover $262,550.17 as compensation for her medical expenses, the only amount that Crozer Burn Center and Stayton's other providers would receive as payment, and the maximum amount that Medicare could recover from Stayton. It concluded that preventing the plaintiff from recovering "inflated and fictitious damages" reduced the possibility of overly-inflated special damage awards, which are often based on awards for actual damages, and ameliorated the increasing cost of liability insurance coverage for healthcare providers.[18]

## III. ANALYSIS

Where an injured plaintiff seeks to recover for medical services, the plaintiff must prove two distinct issues – first that the value claimed for medical services is reasonable, and second that the need for medical services was proximately caused by the tortfeasor's negligence.[19] Here we focus on whether the amount claimed by Stayton—the full amount of her hospital bill—reasonably approximates the value of her medical services.

On appeal, Stayton asks this Court to reverse the Superior Court's judgment, arguing that it shifts the benefit of Medicare from the victim to the tortfeasor, contrary to the collateral source rule and the Restatement (Second) of Torts. Stayton also contends that a rule limiting her recovery to the amount of Medicare

---

[18] *Stayton v. Delaware Health Corp.*, 2014 WL 4782997, at *2.
[19] *Mitchell*, 883 A.2d at 37.

payments would differentiate between similarly situated personal injury claimants because victims covered by Medicare would receive less compensation in a tort suit than parties with private medical insurance coverage.

The defendants contend in response that the Superior Court correctly found that the collateral source rule does not apply to the written-off portion of Stayton's medical bills because Stayton did not contract with Crozer Burn Center or her other providers to accept a discount, nor did she contract for Medicare benefits. The defendants also argue that Medicare is different from other private collateral sources: specifically, Crozer Burn Center and Stayton's other providers have a legal obligation to accept a lower payment, determined by Medicare, for its medical services, and Medicare has no right of subrogation for the written-off portion of Stayton's medical bills. They also contend that the total charges submitted to Medicare were based on factors other than the reasonable value of the medical services provided, and as such, the collateral source rule cannot permit recovery of those inflated, illusory charges. Finally, the defendants argue that a contrary ruling conflicts with tort law principles, which attempt to put a victim as close as possible to the same position as the victim was in before the injury.

The Chamber of Commerce of the United States filed an *amicus curiae* brief in support of defendants. It argues that we should affirm the Superior Court's ruling because allowing Stayton to recover medical expenses that were never paid

would merely generate windfalls for plaintiffs and their lawyers. Because the gap between the amount paid by Medicare and the actual medical bill is often quite large, requiring a damage payment for the full amount billed would lead to a substantial increase in insurance premiums, harming businesses and consumers.

We review the Superior Court's legal determination *de novo*.[20]

A. Delaware's Collateral Source Rule

The collateral source rule is of common law origin[21] and has deep roots in American jurisprudence and Delaware law. Its first application in the United States "was apparently more than one hundred fifty years ago in a case ultimately decided by the United States Supreme Court."[22] More than a half century ago, this Court recognized the collateral source rule as "firmly embedded in our law."[23]

The collateral source rule is "designed to strike a balance between two competing principles of tort law: (1) a plaintiff is entitled to compensation sufficient to make him whole, but no more; and (2) a defendant is liable for all damages that proximately result from his wrong."[24] Where a plaintiff receives payments or compensation from a third party source, the plaintiff's net loss will be less than the full damages proximately caused by the tortfeasor's wrongdoing.

---

[20] *General Motors Corp. v. New Castle County*, 701 A.2d 819, 822 (Del. 1997).
[21] Restatement (Second) of Torts § 920A, cmt. d.
[22] *Mitchell*, 883 A.2d at 37 (discussing *The Propeller Monticello v. Mollison*, 58 U.S. 152 (1854)).
[23] *Yarrington v. Thornburg*, 205 A.2d 1, 2 (Del. 1964).
[24] *Mitchell*, 883 A.2d at 38.

When such payments or compensation are provided by a source independent of the tortfeasor, the collateral source rule, "based on the quasi-punitive nature of tort law liability,"[25] operates to allocate the resulting windfall to the plaintiff rather than the defendant. "A plaintiff who receives a double recovery for a single tort enjoys a windfall; a defendant who escapes, in whole or in part, liability for his wrong enjoys a windfall. Because the law must sanction one windfall and deny the other, it favors the victim of the wrong rather than the wrongdoer."[26]

When the rule applies, a tortfeasor cannot reduce its damages because of payments or compensation received by the injured person from an independent source.[27] The rule is "predicated on the theory that a tortfeasor has no interest in, and therefore no right to benefit from, monies received by the injured person from sources unconnected with the defendant."[28]

---

[25] *Id.*

[26] *Id.* Even though the right to recover the written off amount might be termed a windfall, the amount of the windfall is affected by subrogation rights. Most private insurance policies provide a subrogation right to the insurer covering its payments. Guillermo Gabriel Zorogastua, *Improperly Divorced From Its Roots: The Rationales of the Collateral Source Rule and Their Implications for Medicare and Medicaid Write-Offs*, 55 U. KAN. L. REV. 463, 470 n.56 (2007) (quoting Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 141.2(c)(2)). As noted earlier, Medicare and Medicaid beneficiaries are subject to a lien covering government payments on any personal injury recovery. 42 U.S.C. § 1395y(b)(2)(B)(iii); 42 C.F.R. § 411.37(c).

[27] Restatement (Second) of Torts § 920A.

[28] *Mitchell*, 883 A.2d at 37-38

B. The Collateral Source Rule and Healthcare Provider Write-Offs

Even though the collateral source rule has been recognized by most states,[29] it has not been uniformly applied to healthcare provider write-offs. States have generally taken one of three approaches. Some states apply the rule to healthcare provider write-offs in the same manner as they apply it to third-party payments, such as payments by insurers. Other states apply the rule to provider write-offs, but only if the injured party can be said to have bargained for the write-off. A third group of states refuses to apply the rule to provider write-offs altogether.

States that apply the collateral source rule to provider write-offs as they do to third party payments view provider write-offs as benefits conferred on plaintiffs by providers, in the form of services gratuitously rendered at a price below the standard rate.[30] These states emphasize the collateral source rule's traditional purpose of ensuring that benefits conferred on injured parties by third parties do not end up going to the defendants who injured them, unless the defendants can

---

[29] *Yarrington*, 205 A.2d at 2.

[30] *See Bynum v. Magno*, 101 P.3d 1149, 1156 (Haw. 2004) ("Because a plaintiff like Joseph is not required to pay the difference between the standard rate and the Medicare/Medicaid payment, that part of such medical services attributable to such difference could be viewed conceptually as gratuitous service to the plaintiff, so as to come within the collateral source rule."); *Wills v. Foster*, 892 N.E.2d 1018, 1024 (Ill. 2008) (citing comment c(3) to the Restatement (Second) of Torts § 920A regarding gratuities, which states "the fact the doctor did not charge for his services . . . does not prevent [the plaintiff's] recovery for the full value of the services").

legitimately claim credit for the benefit.[31]  As expressed in comment b to the

Restatement (Second) of Torts § 920A:

> The injured party's net loss may have been reduced [by a collateral source benefit], and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury.  But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.  If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself.  If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.  The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him.[32]

States that apply the collateral source rule to write-offs "bargained for" by

the injured party express concern about granting double recoveries to plaintiffs

given rising insurance costs, but on balance believe that applying the rule to

bargained-for write-offs honors the insurance arrangement that the plaintiffs have

paid consideration for, and encourages the purchase of insurance.[33]  Respecting

---

[31] *See Bynum*, 101 P.3d at 1154 ("Comment b to [Restatement (Second) of Torts] § 920A . . . explains that, although double compensation may result to the plaintiff, such a benefit should redound to the injured party rather than 'become a windfall' to the party causing the injury.") *Wills*, 892 N.E.2d at 1030 ("A benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.") (internal quotation omitted).

[32] Restatement of Torts § 920A, cmt. b.

[33] *See Bozeman v. State*, 879 So.2d 692, 704 (La. 2004) ("The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and other eventualities.") (quoting *Helfand v. California Rapid Transit District*, 465 P.2d 61, 66 (Cal. 1970)); *Acuar v. Letourneau*, 531 S.E.2d 316, 322 (Va. 2000) ("Those amounts

insurance benefits that are bargained for stands in contrast to the traditional Restatement justification for the collateral source rule. Under the Restatement, the collateral source rule allocates any windfall to plaintiffs because *tortfeasors do not* have a legitimate claim to such windfalls and, as between the two, plaintiff should get the windfall. Benefit-of-the-bargain states allocate bargained-for "windfalls" to plaintiffs on the theory that *plaintiffs do* have legitimate claims to them. If in bargaining for insurance, insureds bargain for healthcare provider write-offs, then allowing them to recover provider write-offs from defendants allows them to benefit from that bargain. This, in turn, makes purchasing insurance more attractive.

The last group of states disagrees, as a threshold matter, that the collateral source rule, by its express terms, applies to provider write-offs. These states reason that provider write-offs are not, in the words of the Restatement, "[p]ayments made to or benefits conferred on the injured party . . . ."[34] The written

---

written off are as much of a benefit for which [the plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers.").

[34] Restatement (Second) of Torts § 920A(2). S*ee Howell v. Hamilton Meat & Provisions, Inc.*, 257 P.3d 1130, 1133 (Cal. 20011) (finding the collateral source rule inapplicable to provider write-offs because "[t]hey are neither paid to the providers on the plaintiff's behalf nor paid to the plaintiff in indemnity of his or her expenses"); *Stanley v. Walker*, 906 N.E.2d 852, 857-58 (Ind. 2009) ("[B]ecause no one pays the negotiated reduction, admitting evidence of [write-offs] does not violate the purpose behind the collateral-source rule. The tortfeasor does not obtain credit because of payments made by a third party on behalf of the plaintiff.") (quoting *Robinson v. Bates*, 857 N.E.2d 1195, 1200 (2006)); *Robinson* 857 N.E.2d at 1200 ("The collateral source rule does not apply to write-offs of expenses that are never paid . . . . Because no one pays the write-off, it cannot possibly constitute any *payment* of a benefit from a collateral source.") (emphasis in original); *Moorhead v. Crozer Chester Med. Ctr.*, 765 A.2d 786, 791 (Pa. 2001)

off portions of medical bills are paid by no one. Though the healthcare provider confers a benefit on the injured party by writing off a portion of its bill in the event the injured party is the payer, when the payer is Medicare, Medicaid, or private insurance, the benefit accrues to the taxpayers or the private insurer.

This Court has applied the collateral source rule to provider write-offs as it has to third party payments. In *Onusko*, a physical therapist voluntarily reduced the price of treatment sessions from $534 to $282 per visit for the uninsured plaintiff. This Court applied the collateral source rule to the amounts written off by the therapist and upheld the trial judge's decision to allow the plaintiff to present the jury with the $534 the therapist normally charged as evidence of the reasonable value of the therapy sessions.[35] The Court relied on the Restatement (Second) of Torts which explains:

> Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable. . . . This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services . . . does not prevent his recovery for the reasonable value of the services.[36]

---

(finding the collateral source rule inapplicable to the provider's write-off, "since that amount was not paid by any collateral source"); *Haygood v. De Escabedo*, 356 S.W.3d 390, 395 (Tex. 2011) ("The benefit of insurance to the insured is the payment of charges to owed to the health care provider. An adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer, one it obtains from the provider for itself, not for the insured.").

[35] *Onusko*, 880 A.2d at 1024-25.

[36] Restatement (Second) of Torts § 920A(2); comment c.(3).

In *Mitchell*, the defendant sought to limit the plaintiff's recovery to the amount paid by his private health insurer, Blue Cross, arguing that the plaintiff could not recover the full amounts of his medical bills unless those amounts were actually paid by Blue Cross. We disagreed, observing,

> [W]e recently held in *Onusko v. Kerr*, the portions of medical expenses that health care providers write off constitute "compensation or indemnity received by a tort victim from a source collateral to the tortfeasor." The result is the same whether the write-off is generated by a cash payment such as Kerr's or, as in this case, because of a reduction attributable to a health insurance contract for which the tortfeasor paid no compensation.[37]

---

[37] *Mitchell*, 883 A.2d at 40 (quoting *Acuar*, 531 S.E.2d at 320). We disagree with the Superior Court's view that Delaware has adopted a benefit-of-the-bargain approach to the collateral source rule. The Superior Court relies on *State Farm Mut. Auto Ins. Co. v. Nalbone*, 569 A.2d 71 (Del. 1989), and suggests that our later decision in *Mitchell* "followed a contract law inspired principle" from that case. *Stayton*, 2014 WL 4782997, at *2. In *Nalbone* the plaintiff sought to extend the tort law collateral source rule to contract cases under Delaware's no-fault automobile insurance statute. This Court rejected that effort, and held that "the policy goals of no-fault insurance can best be served by application of principles of contract rather than tort law." *Nalbone*, 569 A.2d at 75. The Superior Court drew upon *Nalbone*'s holding that, "[i]f the collateral payments are received gratis, then their receipt should bar recovery under the no-fault policy." *See Stayton*, 2014 WL 4782997, at *2 ("According to [*Nalbone*], if a plaintiff has paid consideration 'for recovery from a collateral source' than the double recovery is permissible. If, however, the collateral source payments are 'received gratis' then such double recovery should be barred.") (quoting *Nalbone*, 569 A.2d at 75). Applied in the tort context, though, this holding is directly contrary to this Court's decision sixteen years later in *Onusko* and the comment from the Restatement relied upon by us in that case. *Onusko*, 880 A.2d at 1024 (allowing the plaintiff to recover amounts written off by the plaintiff's healthcare provider, citing comment c(3) to the Restatement (Second) of Torts § 920A, regarding gratuities). It is true that this Court discussed contracts in *Mitchell*, but the contracts reviewed in *Mitchell* were the contracts between the Mitchells' health insurance carrier and the Mitchells' health care providers. Those contracts were relied on to find that the *tortfeasor* had no claim to benefit from the amounts the Mitchells' health care providers wrote off pursuant to those contracts. This Court observed, "[t]he vast majority of courts have held that the collateral source rule prohibits the *tortfeasor* from reaping the benefit of a health insurance contract for which the *tortfeasor* has paid no compensation." *Mitchell*, 883 A.2d. at 38 (emphasis added). Our emphasis on denying the tortfeasor a windfall, even if it resulted in a double recovery to plaintiffs, was based not on the contractual expectations of the plaintiffs, but "on the quasi-punitive nature of tort law liability." *Id.* Our

16

We held the plaintiff was entitled to present evidence of the full amount of his medical bills without any reduction for the amounts written off by his providers because of their contracts with Blue Cross.

## C. Medicare Write-offs

In *Onusko* and *Mitchell*, the written off portions of the plaintiffs' medical bills were far more modest in relation to the amounts actually paid than in this case. The fact that the written off portion of Stayton's medical bills is thirteen times the amount paid gives us pause. It reflects the purchasing power of Medicare, given the size of its beneficiary population. It is also reflects the way in which the realities of today's healthcare economy diverge from the traditional underpinnings of the collateral source rule.

Discounting is the rule rather than the exception in healthcare today. "[O]nly a small fraction of persons receiving medical services actually pay original amounts billed for those services."[38] The small share that do are typically uninsured and yet not without means, a population that is expected to decline as a result of the insurance mandate of the Patient Protection and Affordable Care Act.[39]

---

case law does not reflect a benefit-of-the-bargain approach and, for the reasons discussed in Part III.C *infra*, it is not an approach we are inclined to adopt.

[38] Thomas R. Ireland, *The Concept of Reasonable Value in Recovery of Medical Expenses in Personal Injury Torts*, 14 J. LEGAL ECON. 87, 88 (2008).

[39] Pub. L. No. 111-148, 124 Stat. 119 (2010). *See* Ann S. Levin, *The Fate of the Collateral Source Rule After Healthcare Reform*, 60 UCLA L. REV. 736, 742 (2013) ("Because of [the

Whether to apply the collateral source rule to Medicare write-offs is a question of first impression for this Court. In our view, it is hard to characterize the discounts that healthcare providers agree to with third party payers as benefits conferred by providers on injured parties. These are not gratuities. Before Stayton entered the hospital, the federal government had set Medicare's reimbursement rates for the services she would receive and Crozer Burn Center had agreed to accept those rates for the treatment of Medicare patients. The federal government acted out of consideration for the taxpayers. Crozer Burn Center presumably acted with patient volume in mind.

It is similarly hard to view these discounts as benefits bargained for by the patient. As stated in *Haygood v. De Escabedo*:

> The benefit of insurance to the insured is the payment of charges owed to the health care provider. An adjustment in the amount of those charges to arrive at the amount owed is a benefit to the insurer, one it obtains from the provider for itself, not for the insured.[40]

Treating provider write-offs as if they were benefits bargained for by insureds theoretically encourages individuals to purchase health insurance. In

---

Patient Protection and Affordable Care Act's] individual mandate requirement (effective January 1, 2014), almost everyone will be insured. Thus defendants will rarely, if ever, encounter plaintiffs whose medical bills are paid in full at the billed rate rather than at the lower negotiated rate paid by insurance companies.").

[40] *Haygood*, 356 S.W.3d at 395. *See also Martinez v. Milburn Enterprises, Inc.*, 233 P.3d 205, 232-33 (Kan. 2010) (Johnson, J., concurring) (explaining that the purchaser of health insurance bargains for, "the reimbursement or payment for needed medical services which might be required for any reason, including illnesses, as well as accidents," and that, "an insured is unconcerned about how much it will cost the insurer to fulfill its policy obligation . . . .").

reality, though, we suspect few individuals decide to purchase health insurance because they expect to be tort victims and want to assure themselves a double recovery. It is far more likely that decisions to purchase or not purchase insurance are motivated by consideration of the cost of the premiums and the health coverage to be gained in return for those premiums. Since the passage of the Patient Care and Affordable Care Act, the penalties to be incurred for failing to purchase insurance have undoubtedly played a role as well.

Though we applied the collateral source rule to provider write-offs in *Mitchell* and *Onusko*, we decline today to extend that application to amounts that a healthcare provider is required to write off for Medicare patients. Instead we follow the view that provider write-offs are not payments made to or benefits conferred on the injured party. The $3,421,246.94 that Stayton's healthcare providers wrote off was paid by no one. Any benefit that Stayton's healthcare providers conferred in writing off over ninety percent of their collective charges was conferred on federal taxpayers, as a consequence of Medicare's purchasing power. Thus, the collateral source rule does not apply to the amounts written off by Stayton's healthcare providers.

D. Reasonable Value of Medical Services

Because we find that the collateral source rule does not apply to Medicare write-offs, the question becomes how to determine the reasonable value of medical

19

services where there are Medicare write-offs. Like the application of the collateral source rule to write-offs, states diverge on how to measure reasonable value when the amount paid differs from the amount that might be billed for medical services. Among states that do not apply the collateral source rule to provider write-offs, some treat the determination of the reasonable value of medical services as a jury question, as is done where the collateral source rule applies. Other states that do not apply the collateral source rule to provider write-offs treat the amount paid as dispositive of the reasonable value of the services as a matter of law.

States that continue to leave the reasonable value determination to the jury, despite finding the collateral source rule inapplicable to write-offs, believe that the "realities of health care finance"[41] today defy categorical rules. Just as the amounts healthcare providers charge today are not, in any realistic sense, standard or going rates, neither are the amounts paid by particular payers. The rates paid depend on the patient volumes the payers can offer providers in exchange for discounts. Thus, courts in these states reason, neither the amount charged nor the amount paid are dispositive of the reasonable value of the services provided.[42] Furthermore, courts in these states worry that treating the amount paid as dispositive effectively creates different classes of plaintiffs based on the sources of their healthcare

---

[41] *Stanley*, 906 N.E.2d at 857.
[42] *See id.* ("The complexities of health care pricing structures make it difficult to determine whether the amount paid, the amount billed, or an amount in between represents the reasonable value of medical services.").

coverage.[43] Given the particularly hard bargain that government drives with providers, poor and disabled persons covered by government programs will receive the lowest recovery in litigation. To address these concerns, courts in these states allow the jury to determine the reasonable value of medical services rendered to the plaintiff by considering expert testimony and all other relevant evidence, including the billed amount and the amount actually paid for the medical services.[44]

States that find the amount paid dispositive of the reasonable value as a matter of law suggest that the collateral source rule is an exception to the general rule of damages. Where the rule does not apply, the determination of damages ought to proceed under the principle that a plaintiff is entitled to compensation sufficient to make her whole, but no more.[45] It contravenes this principle to count

---

[43] *See Robinson*, 857 N.E.2d at 1200 ("To avoid the creation of separate categories of plaintiffs based on individual insurance coverage, we decline to adopt a categorical rule . . . . Due to the realities of today's insurance and reimbursement system, in any given case, [the reasonable value] determination is not necessarily the amount of the original bill or the amount paid.").

[44] *See Stanley*, 906 N.E.2d at 858 ("Given the current state of the health care pricing system . . . the jury may well need the amount of the payments, amounts billed by medical service providers, and other relevant and admissible evidence to be able to determine the amount of reasonable medical expenses. To assist the jury in this regard, a defendant may cross-examine any witness called by the plaintiff to establish reasonableness. The defendant may also introduce its own witnesses to testify that the billed amounts do not represent the reasonable value of the services. Additionally, the defendant may introduce the discounted amounts into evidence to rebut the reasonableness of charges introduced by the plaintiff.")

[45] *See Haygood*, 356 S.W.3d at 394 ("As a general principle, compensatory damages, like medical expenses, are intended to make the plaintiff whole for any losses resulting from the defendant's interference with the plaintiff's rights. The collateral source rule is an exception.") (internal citations omitted).

amounts for which no one made payments or incurred liability as damages.[46]

Comment h to the Restatement (Second) of Torts § 911, addressing the determination of value for the purposes of tort damages, supports the position that the amount paid is dispositive as a matter of law.[47]

> When the plaintiff seeks to recover for expenditures made or liability incurred to third parties for services rendered, normally the amount recovered is the reasonable value of the services rather than the amount paid or charged. If, however, the injured person paid less than the exchange rate, he can recover no more than the amount paid, except when the low rate was intended as a gift to him.[48]

The fact that Stayton's healthcare providers collectively accepted less than a tenth of the amount they might have billed, and did so not as a gratuitous exception but as part of an agreement with a high-volume payer, makes it difficult to conclude that the billed amounts represent the reasonable value of the medical

---

[46] *See Howell*, 257 P.3d at 1138 ("To be recoverable as expenses, monies must generally have been expended, or at least incurred . . . .") (internal quotation omitted); *Moorhead*, 765 A.2d at 789 ("The expenses for which a plaintiff may recover must be such as have been actually paid, or such as, in the judgment of the jury, are reasonably necessary to be incurred.") (internal quotation omitted).

[47] A number of courts have challenged the relevance to these cases of comment h to § 911 because by its terms it applies "when the plaintiff seeks to recover for expenditures made or liability to third parties for services rendered" and plaintiffs seeking recovery for medical services damages are not seeking "to recover for expenditures made or liability to third parties for services rendered." *Bynum*, 101 P.3d at 1159; *Wills*, 892 N.E.2d at 1027-28. To the extent plaintiffs seeking to recover medical services damages have not made expenditures or incurred liability to their medical services providers, it is only due to collateral source *payments*. Even courts that do not apply the collateral source rule to provider *write-offs* agree that a plaintiff is entitled to recover as if such collateral source *payments* had not been made, in which case the plaintiff would have incurred a liability to the providers. In any case, a collateral source payer often has a subrogation right, standing in the plaintiff's shoes, to recover for the payments it made to the providers on the plaintiff's behalf. In either case, recovery is had as if payments were made or a liability incurred.

[48] Restatement (Second) of Torts § 911, cmt. h.

services.  On the other hand, the fact that Stayton's providers agreed up front to provide their services to Medicare patients in exchange for the amount Medicare pays for those services suggests that the amount paid might be in the range of what should be considered reasonable.

There are several shortcomings to the jury approach.  Evidence of the amount billed and the amount paid are both relevant to the question of the reasonable value of medical services.  But introducing the amount paid into evidence informs jurors that the plaintiff's medical expenses have been at least partially paid for by a collateral source.  This creates a risk that jurors will absolve the defendant of liability for that amount paid by the collateral source.  This reduction in the plaintiff's recovery, for a *payment* from a third party payer, is disallowed by the collateral source rule, even if a reduction for a provider write-off is not.  Indeed, preventing reduction in the plaintiff's recovery for a collateral source payment is the prototypical application of the rule.  Thus, in an effort to strike a balance in connection with write-offs to which the collateral source rule does not apply, the jury approach undercuts the rule in connection with third party payments to which the rule indisputably does apply.  Finally there is the cost to the system of requiring multiple experts to testify about the reasonable value of the medical services.

On balance, we believe the better course is to treat the amount paid by Medicare as dispositive of the reasonable value of healthcare provider services. Delaware has followed the Restatement (Second) of Torts in its application of the collateral source rule.[49] The fact that treating the amount paid as dispositive is consistent with § 911 of the Restatement gives us confidence that the approach we adopt today is not only administrable but fully consistent with the common law tort principles underlying Delaware's collateral source rule.

The collateral source rule is an exception to the general principles governing compensatory damages. That exception does not apply here, so recovery, if it is had, should be had in accordance with the ordinarily damage principles. In Delaware "a plaintiff is entitled to compensation sufficient to make him whole, but no more."[50] In other words, the remedy for the tort should put the plaintiff as close as possible to the same position as she was in before the injury. Stayton's claim for medical expenses is a claim for economic loss, which is defined as "a financial loss."[51] It is undisputed that Stayton will not be obligated to pay for medical expenses above the amount paid by Medicare, and thus, an award of $262,550.17 would fully compensate her for any economic loss from her medical treatment. This Court has also held that a plaintiff cannot recover speculative or conjectural

---

[49] See *Mitchell*, 883 A.2d at 38-39 (citing the Restatement (Second) of Torts § 920A and § 920A, cmt. b); *Onusko*, 880 A.2d at 1024-25 (citing the Restatement (Second) of Torts § 920A and § 920A, cmt. c(3)).

[50] *Mitchell*, 883 A.2d at 38 (internal quotations omitted).

[51] Restatement (Third) of Torts § 1 TD No. 1 (2012).

damages because the law "refuses to allow a plaintiff damages relating to the future consequences of a tortious injury unless the proofs establish with reasonable probability the nature and extent of those consequences."[52] Here, because Stayton has not paid and will not be required to pay medical expenses above the amount paid by Medicare, her claim for the written-off portion of her medical bill seeks compensation for harm that will never occur, which is even less substantial than speculative harm.

## IV. CONCLUSION

For the foregoing reasons, we affirm the judgment of the Superior Court that the collateral source rule does not apply to Medicare write-offs. Stayton's heathcare provider expenses are limited to the amount paid by CMS for her medical care.

---

[52] *Laskowski v. Wallis*, 205 A.2d 825, 826 (Del. 1964).

25

**STRINE**, Chief Justice, concurring:

I join the excellent opinion of the Court, and write separately only to note that this decision illustrates the wisdom of taking a Hippocratic approach to applying long-standing doctrines that have been extended beyond what was necessary to accomplish their original goal. In other words, by taking a "this far, no further" approach to the collateral source rule, the Court adheres to the principle, "first do no harm."

The Court respects the reality that Harbor Healthcare has not asked us to narrow the reach of the collateral source rule, but only to refuse to extend it to this context. But the case before us calls into question the wisdom of applying the collateral source rule—itself an exception to the general rule of damages that a plaintiff is entitled to be made whole and nothing more[53]—in its current form, in an era where we are closer to achieving universal healthcare, and where rising healthcare costs are reducing access to care and harming our nation's economic health. For these reasons, other courts have restricted and even eliminated the collateral source rule.[54] In both a situation like the current case involving Medicare

---

[53] *See* 25 C.J.S. *Damages* § 189 (2015) ("The collateral-source rule is an exception to the general rule of damages preventing a double recovery by an injured party, or in other words, it is an exception to the general rule that in a tort action, the measure of damages is that that will compensate and make the plaintiff whole.").

[54] *E.g.*, Bryce Benjet, *A Review of State Law Modifying the Collateral Source Rule: Seeking Greater Fairness in Economic Damages Awards*, 76 DEF. COUNS. J. 210 (2009) (noting that "although the [collateral source] rule is entrenched in the common law, there is a growing trend to restrict, if not abolish, the rule," and citing cases); Gary T. Schwartz, *A National Health Care*

write-offs, and also a related situation where a hospital or other provider voluntarily gives free or discounted medical care, any recovery from the tortfeasor on the theory that the provider accepted less than the reasonable value of the plaintiff's medical services should go to that provider, and not to the plaintiff who did not pay any out-of-pocket costs, and only if the provider itself desires to recover the supposed shortfall.

As the Court notes, the collateral source rule emerged to "balance between two competing principles of tort law: (1) a plaintiff is entitled to compensation sufficient to make him whole, but no more; and (2) a defendant is liable for all damages that proximately result from his wrong."[55] Thus, when properly applied, the rule ensures that the party whose negligence caused the injury bears all of the resulting costs, which provides a useful financial incentive for the exercise of due

---

*Program: What Its Effect Would Be on American Tort Law and Malpractice Law*, 79 CORNELL L. REV. 1339, 1341 (1994) ("[T]he collateral source rule has by now been abolished in several states."); Michael K. Beard, *The Impact of Changes in Health Care Provider Reimbursement Systems on the Recovery of Damages for Medical Expenses in Personal Injury Suits*, 21 AM. J. TRIAL ADVOC. 453, 476-77 (1998) ("The collateral source rule and its policy justifications were widely accepted before health insurance became prevalent. Therefore, it was foreordained that the rule would be applied to all forms of health insurance. . . . Only with the tort reform legislation of the last twenty years has there been any substantial modifications to the rule . . . "); 3 Litigating Tort Cases § 30:5 ("Several states have abolished or modified the collateral source rule in medical malpractice cases."); *cf.* John G. Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law*, 54 CALIF. L. REV. 1478, 1478-82 (1966) (noting that the rationale for the collateral source rule when adopted—shifting losses to more affluent parties—has become less compelling in a society that prioritizes social programs over tort recovery as a mechanism for loss shifting); Rebecca Levenson, Comment, *Allocating the Costs of Harm to Where They Are Due: Modifying the Collateral Source Rule After Healthcare Reform*, 160 U. PA. L. REV. 921 (2012) (arguing that the collateral source rule should be limited in the wake of the individual mandate under the Affordable Care Act).

[55] *Mitchell v. Halder*, 883 A.2d 32, 38 (Del. 2006).

care by defendants like Harbor Healthcare.[56]   It is especially important to put the cost of care for preventable medical injuries on the tortfeasor, not because of a desire to be generous to health insurers, even governmental ones.  The reason is that when health insurers bear excess costs because they must pay the costs of care resulting from preventable injuries, they will charge higher rates, increasing societal healthcare costs, and potentially inhibiting the receipt of necessary care by the economically vulnerable.

Historically, courts have applied the collateral source rule to allow a plaintiff to recover the full cost of her medical bill from the tortfeasor even when her insurance company paid for all or a portion of it.[57]   In such cases, subrogation rights have often operated to eliminate any "double recovery" for the plaintiff, and thus avoided the problem of short-changing the insurer.

In this case, by contrast, if we were to apply the collateral source rule to allow Stayton to recover the full amount of her medical bill, it would not help the real party that Stayton contends was short-changed: Crozer Burn Center.  Stayton's lawyer is not acting as the champion of a hospital that he alleges did not receive fair reimbursement for providing critical care to his client, but is instead seeking to have his client pocket compensation for hospital charges that she was never

---

[56] *See* 25 C.J.S. *Damages* § 189 (2015) ("The collateral-source rule, like other tort principles, also aims at deterring a tortfeasor's negligent conduct, and accordingly, it makes the tortfeasor fully responsible for damages caused as a result of tortious conduct.").
[57] *See, e.g.*, *Mitchell*, 883 A.2d at 38.

28

obligated to pay, charges that are thirteen times greater than the amount that Medicare actually paid on his client's behalf. Likewise, if the collateral source rule was employed to allow a plaintiff such as Stayton to recover the full cost of medical treatment she received for free, rather than requiring her recovery to go to the hospital, the rule would perversely provide a windfall for the plaintiff, rather than fairly allocate an award of expenses to the party that actually incurred them.

It makes sense not only as a matter of good incentives, but of fundamental fairness, to ensure that a provider that gives charitable or discounted care to help a tort victim who cannot pay for the care is able to be topped up to market when the tortfeasor is held accountable for the tort. But why the plaintiff should get to pocket the difference for herself as part of her recovery, leaving the provider who did the good deed with a shortfall, measured precisely by the extent of the plaintiff's own windfall, is harder to understand.[58] That seems a poor repayment to the provider for its charity.

---

[58] In *Onusko v. Kerr*, for example, a physical therapist lowered his rates for an uninsured patient who was injured in a motorcycle crash. The patient was then allowed to recover the full market rate from the tortfeasor under the collateral source rule, with no apparent obligation to make the physical therapist whole for the amount that he should have received. *See Onusko v. Kerr*, 880 A.2d 1022, 1024-25 (Del. 2005) (quoting the Restatement (Second) of Torts § 920A(2) and comment c.(3) for the proposition that "[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or part of the harm for which the tortfeasor is liable. . . . This applies to cash gratuities and to the rendering of services. Thus the fact that the doctor did not charge for his services . . . does not prevent [the plaintiff's] recovery for the reasonable value of the services.").

Of course, the common law might determine that a plaintiff who acts as an enforcement agent for herself and her healthcare provider should receive an award of attorneys' fees and costs to ensure that the net recovery of her healthcare costs is not reduced by any enforcement costs. Even under that approach, windfalls should be avoided, and there should be no double recovery of enforcement costs or any incentives created to run them up.[59] In considering issues like this, it must be remembered that plaintiffs like Stayton may also bring claims for non-economic damages, such as damages for pain and suffering, and for economic damages unrelated to healthcare costs, such as lost income.[60] But permitting a plaintiff to recover more than her financial loss as damages for theoretical expenses that she or her insurer will never be obligated to pay serves no useful purpose, and instead creates rents for lawyers, raises costs for employers in the form of higher liability insurance premiums, and bestows windfalls on certain plaintiffs, not for rational reasons, but for happenstance.

---

[59] The rare case where a double recovery should be permitted is where an insured person has contracted for it specifically. In that case, the plaintiff does not really receive a double recovery because the insured party has contracted and paid for the right to recover. Those of us who went to school some decades ago might recall that students were often offered the chance to buy policies that provided for certain payments if a body part suffered specified damage for any reason (for example, $10,000 in the event of a loss of a pinkie). If a parent bought two separate policies of that kind for their child-student, and the student lost a pinkie, both policies would have to pay. That would not involve a double recovery; it would be the exact recovery that the insured party had paid for. *See, e.g.*, *Helfend v. S. Cal. Rapid Transit Dist.*, 465 P.2d 61, 66 (Cal. 1970) (noting that applying the collateral source rule ensures "that a person who has invested years of insurance premiums to assure his medical care . . . receives the benefits of his thrift").

[60] *See* 3 Stein on Personal Injury Damages Treatise § 22:7 (3d ed.).

Allowing a plaintiff like Stayton to recover the full value of the hospital services Crozer provided at a supposed discount would also do nothing to reduce the corresponding harm to social welfare that results from Crozer's increased costs, incurred because of Harbor Health's alleged negligence. When a hospital has to treat additional patients because a tortfeasor failed to exercise due care, its capacity to treat other patients becomes more limited. If the hospital also generously discounts the cost of the services it provides because, for example, the patient was uninsured and unable to pay the full cost of treatment, it will incur even greater costs. Ensuring that any tort recovery for the reasonable cost of treatment goes to the hospital that provided the medical care at a lower-than-market rate ameliorates the overall loss to social welfare due to the tortfeasor's negligence. Moreover, requiring the tortfeasor to bear the full cost of the harm imposed on the victim, the victim's insurer, and the victim's healthcare providers, and no more, sets the right incentive for deterrence.[61]

Because the Court's well-reasoned opinion is directionally sensitive to these concerns, I gladly join it in full.

---

[61] *See, e.g.*, A. Mitchell Polinsky, Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 HARV. L. REV. 869 (1998) ("The central point that we want to explain here is that, if a defendant will definitely be found liable for the harm for which he is responsible, the proper magnitude of damages is equal to the harm the defendant has caused. If damages are either lower or higher than the harm, various socially undesirable consequences will result . . . .").