**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Date Submitted:   June 7, 2021
Draft Report:      September 23, 2021
Final Report:      October 6, 2021

Dean A. Campbell, Esquire
Dean A. Campbell, P.A.
P.O. Box 568
110 West Pine Street
Georgetown, Delaware 19947

*Via U.S. Mail*
Mary M. Lipetz
317 East Street N.E.
Vienna, Virginia 22180

RE:   *Robert Tack v. Mary M. Lipetz, Trustee of the Mary Meade Lipetz Revocable Trust Dated December 6, 2007, as Amended and Completely Restated on June 3, 2010, and The Boxwood House Condominium Association of Owners*
C.A. No. 2020-0576-PWG

Dear Counsel and Ms. Lipetz:

Pending before me is the matter of damages against the defaulted defendant in this case, and the plaintiff's claim against that defendant for attorneys' fees under 25 *Del. C.* §81-417.  Based upon the evidence presented, I find that the defaulted defendant is liable to plaintiff for $18,707.00 in damages for lost rental income, plus post-judgment interest at the legal rate.  I deny the plaintiff's request for an attorneys' fees award.  This is a final report.[1]

---

[1] This report makes the same substantive findings and recommendations as my September 23, 2021 draft report, to which no exceptions were filed.

## I. BACKGROUND[2]

Robert Tack ("Tack") filed his Complaint for Injunctive Relief and Damages on July 14, 2020 against Mary M. Lipetz as Trustee for the Mary Meade Lipetz Revocable Trust Dated December 6, 2007, as Amended and Completely Restated on June 3, 2010, (the "Lipetz Trust")[3] and the Boxwood House Condominium Association of Owners (the "Association").[4] Tack sought injunctive relief against the Lipetz Trust and the Association, seeking to abate trespass and nuisance from a continuing flow of leaking water and resulting money damages.[5] The Association responded on September 10, 2020.[6] The Lipetz Trust was served but failed to respond,[7] and, upon Tack's motion, I granted a default judgment against the Lipetz Trust on November 9, 2020.[8] Following that default judgment, Tack requested an inquisition hearing to determine the amount of damages to be assessed against the

---

[2] I refer to the transcript from the inquisition hearing held on April 19, 2021 as "First Inq. Tr.," and the transcript from the supplemental inquisition hearing held on June 7, 2021 as "Sec. Inq. Tr." I refer to Tack's exhibits admitted at the June 7, 2021 supplemental inquisition hearing as "Sec. Inq. Tr. Ex."

[3] Although Ms. Lipetz and the Lipetz Trust have both been referred to in this action's proceedings, the Lipetz Trust is the defendant in this litigation and Ms. Lipetz's involvement in this litigation is only as trustee for the Lipetz Trust.

[4] Docket Item ("D.I.") 1.

[5] *Id*., at 4-6.

[6] D.I. 3.

[7] *See* D.I. 8.

[8] D.I. 9.

Lipetz Trust related to the default judgment.[9]  An initial inquisition hearing was held on April 19, 2021, and a supplemental inquisition hearing was held on June 7, 2021.[10]  Lipetz Trust, through Ms. Lipetz as trustee, received notice but failed to appear at both inquisition hearings.[11]

On September 21, 2021, Tack and the Association stipulated to a dismissal of Tack's claims against the Association.[12]  I granted that dismissal on September 21, 2021.[13]

---

[9] D.I. 10.  The default judgment order granted injunctive relief. *See* D.I. 9.  However, Tack later noted that the necessity for injunctive relief had become moot. *See* D.I. 10, at 2.  Although the request for equitable relief has been resolved, this Court may retain jurisdiction over money damages claims through its ancillary jurisdiction under the clean-up doctrine. *See Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016).  Having acquired jurisdiction over part of a controversy, this Court may continue to exercise jurisdiction over purely legal matters to "resolve a factual issue which must be determined in the proceedings; to avoid a multiplicity of suits; to promote judicial efficiency; to do full justice . . ." *FirstString Research, Inc. v. JSS Medical Research Inc.*, 2021 WL 2182829, at *6 (Del. Ch. May 28, 2021) (citation omitted).  An unresolved factual issue related to the default judgment is the amount of damages caused by the Lipetz Trust.  For this reason and in the interest of judicial efficiency, I retained jurisdiction in order to determine damages against the Lipetz Trust under the default judgment.

[10] D.I. 16; D.I. 22.  Both hearings were conducted via Zoom.

[11] *See* D.I. 15; D.I. 17.

[12] D.I. 26.

[13] D.I. 28.  Prior to this stipulation of dismissal, Tack and the Association had indicated that they may transfer this case to the Superior Court following this decision to resolve any remaining issues. *See* Sec. Inq. Tr. 10:7-12 (statement of counsel for Tack); *Id.*, 10:18-11:13 (statement of counsel for the Association).

Tack owns real property known as Unit 1-E, The Boxwood House, Wilmington Avenue, Rehoboth Beach, Delaware ("Unit 1-E").[14] The Lipetz Trust owns real property known as Unit 2-E, The Boxwood House, Wilmington Avenue, Rehoboth Beach, Delaware ("Unit 2-E").[15] The Association is a homeowners association comprised of the owners of the condominium units at the Boxwood House in Rehoboth Beach, Delaware.[16] Boxwood House was constructed circa 1969.[17] Unit 1-E is directly below Unit 2-E in the Boxwood House.[18]

Tack purchased Unit 1-E in February of 2019 to use primarily as an investment property for seasonal rentals.[19] At the time, it was an older property and needed certain renovations to enhance its rental value.[20] Tack engaged a local contractor in 2019 to undertake these renovations so that Tack could offer Unit 1-E as a seasonal rental in the 2020 season.[21] During these renovations, the contractor

---

[14] D.I. 1, ¶ 1; First Inq. Tr. 25:19-21.

[15] D.I. 1, ¶ 2.

[16] Sec. Inq. Tr. Ex. 1, Art. I; *Id.*, Art. III.

[17] D.I. 1, ¶ 4.

[18] Sec. Inq. Tr. 15:6-8.

[19] First Inq. Tr. 26:7-13.

[20] *Id.*, 26:21-24.

[21] *Id.*, 27:5-28:12; Sec. Inq. Tr. 14:2-12.

discovered significant water damage in the ceiling of Unit 1-E, and the completion of the renovations was delayed.[22]

The contractor determined that this water damage was "[d]ue to a leak from above," and indicated that the water leak was on-going.[23] This stopped the renovation work on Unit 1-E.[24] The contractor at one point entered Unit 2-E and discovered in Unit 2-E's bathroom "a handful of items that were visibly noticeably leaking, and obvious damage into that unit."[25] The contractor determined that the areas of Unit 2-E in which he discovered leaks were directly above the areas of Unit 1-E that had the worst water damage.[26] He poured water on the bathroom floor of Unit 2-E and saw that water going through to Unit 1-E.[27] He testified that proper maintenance in Unit 2-E, including caulking or flashing around the bathtub and grout around the tile, would have prevented the water leaks.[28] Before the water damage was discovered, the contractor testified that he was on schedule to complete the renovations by Memorial Day of 2020, in time for the tourist rental

---

[22] *Id.*, 14:13-21; First Inq. Tr. 28:15-23.

[23] Sec. Inq. Tr. 14:17; First Inq. Tr. 28:17-23; *Id.*, 41:5-9.

[24] Sec. Inq. Tr. 14:13-15.

[25] *Id.*, 16:1-9. The leaks emanated from cracks in the tile in the bathroom and open areas in Unit 2-E's bathroom floor. *Id.*, 16:12-17:12; *see also* Sec. Inq. Tr. Ex. 9.

[26] Sec. Inq. Tr. 21:19-24:16; *Id.*, 33:15-18.

[27] *Id.*, 23:13-17.

[28] *Id.*, 36:21-37:8; *id.*, 37:16-20.

season.[29]    After the water leaks were repaired, renovation work resumed immediately and was completed around Labor Day of 2020, which did not leave sufficient time to market the property for rentals before the end of the 2020 season.[30]

During the 2019 rental season, Unit 1-E was rented fairly consistently from June 1 to September 21.[31]  In total, Unit 1-E generated $18,707.00 in rental income for the 2019 season.[32]  The realtor, who handled seasonal rentals and specifically rentals of Unit 1-E, testified that Tack was unable to rent Unit 1-E during the 2020 season.[33]  She also testified that, in Rehoboth Beach, Delaware, rental revenues were higher in the 2020 season, despite the COVID-19 pandemic.[34]  She stated that she "would have been able to book [Unit 1-E] very well . . . because we were booked solid with all of our smaller properties."[35]

Tack testified that he seeks damages for lost rental income in the amount of $18,707.00.[36]  He also seeks reasonable attorneys' fees under 25 *Del. C.* §81-417.[37]

---

[29] *Id.*, 40:12-20.

[30] *Id.,* 26:5-17; *id.,* 41:11-18; *id.,* 43:19-44:16.

[31] First Inq. Tr. 15:2-18; *id.*, 17:22-24; Sec. Inq. Tr. Ex. 4.

[32] First Inq. Tr. 16:6-9.

[33] *Id.*, 18:6-8.

[34] *Id.*, 18:19-19:2.

[35] *Id.*, 19:6-14.

[36] *Id.*, 58:1-7.

6

## II. ANALYSIS

### A. *Damage Award Against the Lipetz Trust*

Tack seeks monetary damages resulting from a water leak emanating from the Lipetz Trust's property and impairing his property.[38] Default judgment was entered against the Lipetz Trust on November 9, 2020.[39] Court of Chancery Rule 55(b) states in part "[i]f, in order to enable the Court to enter [default] judgment or to carry it into effect, it is necessary to take into account or to determine the amount of damages . . ., the Court may conduct such hearings or order such references as it deems necessary and proper."[40] "Typically, the sole focus of inquisition hearings is the amount of damages owed to the plaintiff, which is determined by the trial court judge. The Court's findings on damages are based on a preponderance of the evidence."[41]

In my order granting default judgment against the Lipetz Trust, I necessarily determined that water from Unit 2-E had leaked into Unit 1-E and that this conduct

---

[37] *Id.*, 58:11-15; Sec. Inq. Tr. 50:23-52:13.

[38] D.I. 1, at 5.

[39] D.I. 9.

[40] Ct. Ch. R. 55(b).

[41] *Jagger v. Schiavello*, 93 A.3d 656, 659 (Del. Super. 2014) (citation omitted). Preponderance of the evidence means "the side on which the greater weight of the evidence is found." *Id.* (citation omitted). Under the preponderance of the evidence standard, "evidence that is unrebutted when presented by one side should be considered

was tortious.[42]   What was left unresolved in that order was (1) the amount of damages and (2) any apportionment of liability for those damages between the Lipetz Trust and the Association.  The determination of liability is this report is limited solely to the Lipetz Trust.[43]

"The function of a damage award in a civil litigation is to provide just and full compensation to a plaintiff who suffers injury or loss by reason of the conduct of a tortfeasor."[44]  Under Delaware law, "a plaintiff is entitled to compensation to make him whole, but no more."[45]  "In general, a right of action resulting from tortious conduct encompasses all of the reasonably foreseeable consequences of the tort."[46]  A plaintiff may recover "against a tort-feasor for the loss of use of

---

conclusive." *Paton v. Yancy*, 2014 WL 4674600, at \*2 (Del. Super. Sept. 22, 2014) (quoting *Amalfitano v. Baker*, 749 A.2d 575, 578 (Del. 2001)) (cleaned up).

[42] *See* D.I. 9.

[43] The Association's liability is no longer at issue following the entry of the stipulation of dismissal on September 21, 2021. *See* D.I. 28.

[44] *Maier v. Santucci*, 697 A.2d 747, 749 (Del. 1997) (citation omitted); *see also Jardel Co. v. Huges*, 523 A.2d 518, 528 (Del. 1987) ("The object and purpose of an award of compensatory damages in a civil case is to impose satisfaction for an injury done.  In tort actions that satisfaction normally takes the form of an award of monetary damages to an injured plaintiff, with the size of the award directly related to the harm caused by the defendant.") (citation omitted).

[45] *Stayton v. Del. Health Corp.*, 117 A.3d 521, 534 (Del. 2015) (internal quotation marks and citation omitted).

[46] *Gill v. Cleotex Corp.*, 565 A.2d 21, 23 (Del. Super. 1989); *see also Adams v. Hazel*, 102 A.2d 919, 920 (Del. Super. 1954) ("A tort-feasor is liable for all natural, direct and proximate consequences of his wrongful acts or omissions; or, for all the probable consequences of such wrongful acts or omissions.").

property provided that the use was a lawful one and the damages are established with reasonable certainty."[47] In a trespass action, our Supreme Court has indicated that a plaintiff may recover, as foreseeable damages, the fair market rental value of the real property.[48]

Tack presented evidence showing that the water damage to Unit 1-E was caused by leaks originating from Unit 2-E.[49] The evidence shows that the water causing the damage was coming from Unit 2-E and not from any of the common areas over which the Association had control, or other property.[50] Therefore, I conclude that the water damage to Tack's property was caused only by the Lipetz Trust.

Tack produced evidence confirming that Unit 1-E was unable to be rented in the 2020 season because of the water damage.[51] Further, Tack produced evidence showing that his rental income for the 2020 season would have been approximately

---

[47] *Adams*, 102 A.2d at 920.

[48] *See Rohner v. Niemann*, 380 A.2d 549, 554 (Del. 1977).

[49] *See* notes 22-27 *supra* and accompanying text.

[50] *See* Sec. Inq. Tr. 27:9-29:18; *id.*, 34:15-24.

[51] *See* notes 28-29 *supra* and accompanying text.

9

$18,707.00 and that he would have been able to rent it for the full season, had the water leaks not occurred.[52]

Therefore, I conclude that damages in the amount of $18,707.00 shall be assessed against the Lipetz Trust, which will place Tack in the position he would have been but for the Lipetz Trust's tortious conduct.

### B. Attorneys' Fees Under 25 Del. C. § 81-417

Tack seeks reasonable attorneys' fees under 25 *Del. C.* §81-417 (the "Enforcement Provision").[53] First, I note attorneys' fees were not awarded as a part of the default judgment.[54] Considering Tack's fee-shifting request, I decline to award attorneys' fees in this case.

Chapter 81 of Title 25 of the Delaware Code is the Delaware Uniform Common Interest Ownership Act (the "DUCIOA"). By its terms, the DUCIOA applies to common interest communities that were created on or after September

---

[52] *See* notes 30-34 *supra* and accompanying text. I consider that the real estate agent testified that rentals during the 2020 season were "up a considerable amount from 2019 to 2020." *See* First Inq. Tr. 18:23-24; *see also* Sec. Inq. Tr. Ex. 5. Although this suggests that the actual rental income for 2020 might have been higher than in 2019, adjusting this figure based upon this conclusory testimony, would be speculative. I decline to make such an adjustment without more concrete testimony. *See Adams*, 102 A.2d at 920 (damages must be "established with reasonable certainty"). Further, Tack does not seek any additional damages beyond $18,707.00. *See* n. 36 *supra* and accompanying text.

[53] Sec. Inq. Tr. 52:8-13.

[54] D.I. 9.

10

30, 2009.[55] If the common interest community was created before September 30, 2009, it is a "Pre-Existing Community," and the Unit Property Act[56] typically provides the statutory framework governing those common interest communities.[57] A Pre-Existing Community may choose to amend its governing documents to comply with DUCIOA's requirements or may select particular sections of DUCIOA to apply to that community.[58]

However, certain "Enumerated Provisions" apply to Pre-Existing Communities if the community's governing documents do not address an issue.[59] One of these Enumerated Provisions is the Enforcement Provision.[60] The Enforcement Provision states:

> If a declarant or any other person subject to this chapter fails to comply with any of its provisions or any provision of the declaration or bylaws, any person or class adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award court costs and reasonable attorneys' fees.[61]

---

[55] 25 *Del. C.* §81-116.

[56] 25 *Del. C.* §2201 et seq.

[57] *See* 25 *Del. C.* §81-119; *Bragdon v. Bayshore Property Owners Ass'n, Inc.*, 251 A.3d 661, 674 (Del. Ch. 2021).

[58] 25 *Del. C.* §81-119.

[59] *Id.*; *Bragdon*, 251 A.3d at 676.

[60] 25 *Del. C.* §81-119; 25 *Del. C.* §81-417; *Bragdon*, 251 A.3d at 676-77.

[61] 25 *Del. C.* §81-417(a).

Interpreting this provision, Vice Chancellor Laster, in *Bragdon v. Bayshore Property Owners Ass'n, Inc.* [hereinafter "*Bragdon*"],[62] analyzed whether the Enforcement Provision applies in a particular case based upon three elements: (1) whether there had been a violation of DUCIOA or a community's declaration or bylaws, (2) whether there was an adverse effect on the party seeking to recover expenses under the Enforcement Provision, and (3) whether the case is an appropriate case for expense shifting under the statute.[63]

The Enforcement Provision creates a cause of action based in the common interest community's declaration, bylaws or in some independent provision of DUCIOA. When Vice Chancellor Laster in *Bragdon* granted attorneys' fees under this statute, he found that the common interest community's association had breached both the community's declaration and DUCIOA.[64]

In my default judgment ruling, I found that the Lipetz Trust was liable for trespass and nuisance—both common law property torts.[65] I did not find that the

---

[62] 251 A.3d 661 (Del. Ch. 2021).

[63] *Id.* at 677-89.

[64] *Id.* at 679-81.

[65] The default judgment order ordered injunctive relief "necessary to abate the flow of leaking water" and judgment against the Lipetz Trust for reasonable damages resulting from the leak. D.I. 9. It did not award attorneys' fees. *Id.* Tack's motion for default judgment sought injunctive relief and judgment against the Lipetz Trust due to the water leak emanating from its property and damaging Tack's property. D.I. 8. It also asked for attorneys' fees pursuant to 25 *Del. C.* §81-417(a) and provisions in the Declaration and

Lipetz Trust had violated DUCIOA or the Association's Declaration Submitting Real Property to Provisions of Unit Property Act 25 Del. C. §2201, et seq. ("Declaration"),[66] or its Code of Regulations.[67] Tack's Complaint only brought claims for trespass and nuisance against the Lipetz Trust and not for any violation of the Declaration, Code of Regulations, or DUCIOA.[68] My finding of liability in the default judgment against the Lipetz Trust was not based upon any duty arising out of DUCIOA, the Declaration or bylaws. The Enforcement Provision provides that a person's right of action under that statute is contingent upon the failure of another person or entity, who is subject to DUCIOA, to comply with DUCIOA or the Declaration or bylaws.[69] Because Tack sought only damages for common law torts and did not make a claim against the Lipetz Trust for a violation of DUCIOA or the Declaration, the Enforcement Provision is not applicable in this case. Further, the Declaration or Code of Regulations do not specifically provide for fee-shifting.[70]

---

Code of Regulations. *Id.* Tack's Complaint, however, seeks only injunctive relief to abate a continuing trespass and nuisance, resulting damages and attorneys' fees. D.I. 1.

[66] Sec. Inq. Tr. Ex. 7.

[67] *Id.*, Ex. 1.

[68] *See* D.I. 1.

[69] 25 *Del. C.* §81-417; *Bragdon v. Bayshore Property Owners Ass'n, Inc.*, 251 A.3d 661, 677 (Del. Ch. 2021).

[70] *See* Sec. Inq. Tr. Exs. 1, 7.

Finally, I consider whether attorneys' fees should be awarded in this case under the American Rule, which provides that each party is normally responsible for their own attorneys' fees, whatever the outcome of the litigation, absent express statutory language to the contrary or an equitable doctrine exception, such as the bad faith exception.[71] Under the American Rule, Delaware courts have awarded attorneys' fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims."[72] "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the judicial process."[73] Here, I do not find that the Lipetz Trust's actions implicate the bad faith exception, and decline to award attorneys' fees to Tack in this case.

## III. CONCLUSION

For the reasons stated above, I recommend that the Court order that the Mary Meade Lipetz Revocable Trust Dated December 6, 2007, as Amended and Completely Restated on June 3, 2010, is liable to Robert Tack for damages in the amount of $18,707.00, plus post-judgment interest at the legal rate. I also

---

[71] *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1164 (Del. 1989); *see also Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[72] *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (citation omitted).

[73] *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citation omitted).

recommend that the Court decline to award attorneys' fees to Tack in this action.

This is a final Master's Report, and exceptions may be taken under Court of

Chancery Rule 144.[74]

Sincerely,

/s/ Patricia W. Griffin
Master Patricia W. Griffin

---

[74] Because all claims against the Association have been dismissed, this report, when it becomes final, will resolve all remaining issues in this case.